**ALLSTATE INSURANCE COMPANY, Appellant,**

v.

**Ernest PARE, et al., Appellees.**

**No. 09 83 249 CV.**

Court of Appeals of Texas, Beaumont.

March 21, 1985.

Rehearing Denied April 9, 1985.

Gordon R. Pate, Beaumont, for appellant.

William T. Johnson, Beaumont, for appellees.

## OPINION

PER CURIAM.

This appeal results from a suit based on an automobile liability insurance policy. Default judgments were entered against Mark Melancon and Ernest Pare in a prior cause styled *Doris Sztraky v. Mark Melancon, et al.* Each default judgment was for $200,000.00. Doris Sztraky was the mother of Belinda Marie Sztraky, the victim killed in an automobile accident at the beach on June 7, 1980. On that day Melancon was driving the offending motor vehicle owned by Pare and with Pare's permission. Pare had a liability policy with Allstate Insurance Company.

The Allstate policy provided, inter alia, the *insured shall* "immediately forward to the company every demand, notice, summons or other process received by him or his representative." But Allstate's policy also had an endorsement, Form 158L, reading:

"ALLSTATE INSURANCE COMPANY
"A Stock Company—Home Office—Northbrook, Illinois
"ENDORSEMENTS
"(Texas)

"AMENDATORY ENDORSEMENT—NOTICE
"Form 158L—Amendatory Endorsement—Notice
"Texas Standard Automobile Endorsement
"Prescribed March 1, 1973

"As respects bodily injury liability coverage and property damage liability coverage, unless the company is prejudiced by the insured's failure to comply with the requirement, any provision of this policy requiring the insured to give notice of action, occurrence or loss, or requiring the insured to forward demands, notices, summons or other legal process, shall not bar liability under this policy."

Appellant's first of two points of error is:

"*There was no evidence that the Plaintiffs forwarded to the insurance company the suit papers served upon them, a condition precedent to the Defendant's [Allstate] duty to defend un-*

*der the policy....*" (Emphasis in original)

The proper rules of appellate review under the "no evidence" point have been followed by us. *See* Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error," *38 Tex.L.Rev. 361* (1960); Garwood, "The Question of Insufficient Evidence on Appeal," *30 Tex.L.Rev. 803* (1952). We review and analyze this record with reference to Appellant's first point of error, assiduously following the mandates of *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965), and *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (Tex.1951), as well as their legion-like progeny.

■ Appellant's first point of error does not take into account the Amendatory Endorsement, Form 158L, as set out in full above. Hence, neither reversal nor remand can result from this point of error. Point one is overruled.

Appellant's second point of error is that the jury's answers to Special Issues Three and Six are against the great weight and preponderance of the evidence.

■ In deciding this point of error, being a question of fact, the reviewing court at the intermediate level must consider all the evidence. To sustain this point the evidence supporting the finding must be so weak or the evidence to the contrary must be so overwhelming that the jury's answers must be manifestly wrong and unjust.

In Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error," *38 Tex.L. Rev. 361, 366* (1960), then Associate Justice Robert W. Calvert wrote:

"(b) A point of error asserting that a jury's finding of the existence of a vital fact is contrary to the great weight and preponderance of the evidence means exactly what it states in very simple language. It needs no explanation. The point is an 'insufficient evidence' point in the sense that it asserts the insufficiency of the evidence to support a finding of the existence of a vital fact when the

great preponderance of the evidence supports its non-existence."

We also find the following at 367:

"If there is evidence of probative force tending to prove the existence of a vital fact and evidence tending to disprove its existence and the point of error is that the finding is against the great weight and preponderance of the evidence, the rule by which a Court of Civil Appeals should be guided in passing on the point is simple even if the conclusion to be reached in a particular case is difficult. If the finding of the existence of the fact, considering all of the evidence, is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust, the court should sustain the point and order a new trial; otherwise, the court should overrule the point and affirm...."

■ We find sufficient evidence to support the jury's findings to Special Issues Three and Six in that the Plaintiffs' failure to give notice of the lawsuit was not prejudicial to Allstate.

There is evidence in the record that Pare, Allstate's insured, contacted Jay Ayers, Allstate's sales representative, within one or two days after the death of Belinda Sztraky in June, 1980, and, thereafter, returned to discuss the accident with Ayers in either November or December of 1981 at Ayers' office in the Sears Store. Pare told Ayers that a suit was going to be filed against Pare. Pare testified that Ayers later told him that everything in connection with the death of Belinda Sztraky had been settled. Pare verified that, in February of 1982, he again had a conversation with Ayers at his office while making a payment on his insurance policy. Again Ayers reassured him.

Pare swore that after he had notified Ayers several times and had followed Ayers' instructions to call certain collect long distance telephone numbers to Allstate Claims Department, he trusted Allstate to take care of his business in connection with the death claim.

Geraldine Towns, Allstate's unit claims manager, was unable to explain how Allstate was prejudiced between November 17, 1981, and the date of the first default judgment, February 3, 1982. Towns had been sent a copy of the original pleadings, although undated and unnumbered. She took no action in connection therewith. Later on, a default judgment was taken by Glen Morgan, counsel for Doris Sztraky, who notified Towns, "I've got a judgment." Towns admitted that Morgan told her, "Jerri [sic], I'm surprised at you. And I said, 'I beg your pardon?' He said, 'I've just taken default judgment.' And he went ahead and told me and I was shocked." Further testimony of Towns in the statement of facts reads:

"Q  I ask you again. Is the substance of your testimony that you lifted not one finger to inquire one iota between the time that petition, as it turned out, was filed and the first default judgment which, I believe,—I'll stand corrected—is February, an interroloucory [sic] judgment against Mr. Melancon?

"A  No, I did not.

"Q  Didn't even make a phone call?

"A  No, I didn't.

"Q  In fact, never gave it any further thought?

"A  Unless you're reading my mind, you wouldn't know that.

"Q  Who dictates what the policies of a claims adjuster will be? Do you get to make your policy up as you go or does this come from offices on high in the Allstate organization?

"A  Excuse me. Allstate Insurance Company, of course, has many different areas of management and Allstate Insurance Company is the one, the home office, who dictates the practices of Allstate Insurance Company employees. This is disseminated through different managerial levels to the adjusting forces.

"Q  So you're just following the procedures and policies outlined for you by the overall Allstate organization; is that correct?

"A   We are also also [sic] dictated, too, —we have local, local areas, different states because different states have different laws and different areas have different practices.

"Q   If handling seventy or eighty major personal injury cases renders you so busy you can't follow up on one specific case, that's their fault for not giving you another adjuster to share your load; is that right?

"A   You've incorrectly stated it.

"Q   How am I incorrect, please?

"A   By stating that I had seventy or eighty files and did not have time. That was not ever my statement."

The record shows that, after the filing of the lawsuit and before the taking of the default judgment, Morgan testified that he had a conversation with Towns in which they both knew and understood that there would be a settlement offer by Morgan at or below the policy limits. Morgan testified that he actually put her on notice of the lawsuit sometime in November of 1981. Subsequent to November, 1981, and prior to the taking of the first default judgment against Melancon, Morgan testified he talked with Towns, "I don't know how many times. I know for a fact that she was in my office some time [sic] around the first of the year, 1982, and we discussed this case."

Plaintiffs' Exhibit No. 18, which is in evidence, is addressed to Allstate Insurance Company, "Attn: Jerri Townes [sic]," and unequivocally states, inter alia, "Enclosed please find a copy of the Original Petition filed in the above-referenced cause."

Glaringly meaningful is Plaintiffs' Exhibit No. 19 also admitted into evidence. It is a letter from Aetna Casualty & Surety Company, addressed to Towns, concerning Sztraky's death action, signed by "Gerri James, Claims Representative" stating in part:

"I am in hopes that you will re-evaluate this claim upwards and make an attempt to settle this claim within your policy limits, without any further delays.

"Every effort should be made to dispose of this claim, so that our insured [Mark Melancon] will not get a judgement [sic] rendered against him and possibly an excess demand."

Plaintiffs' Exhibit No. 19 is dated December 9, 1981. The default judgment against Melancon was signed and entered February 5, 1982.

Morgan testified that, prior to the taking of the default judgment, Towns offered $28,000.00 to settle. Morgan swore he told Towns he wanted the jury to decide what the death of a minor child was worth. There is also testimony by Morgan that the Houston counsel for Allstate had advised that no additional money over $28,000.00 would be offered. Morgan testified that he knew of the policy limits of $50,000.00 and had offered to settle for $40,000.00, stating that the offer was made in good faith. He also testified that he had authority to settle the case within the policy limits for $40,000.00. Morgan further testified that during the negotiations of the day of Allstate's offer of $28,000.00 and Morgan's counter offer of $40,000.00, Towns had knowledge that the lawsuit had been filed.

Of paramount importance is Plaintiffs' Exhibit No. 20. It is a letter from Towns, as Senior Claim Representative, to Aetna Casualty. Because of its wording we quote it fully:

"November 19, 1981

"AETNA CASUALTY
"916 Petroleum Building
"Beaumont, Texas  77701
"ATTENTION: JANE WATERS
"Dear Jane:
        "RE:  CLAIM #: 154 948268 3WGT
              "YOUR INSURED: MARK MELANCON
              "OUR INSURED: ERNEST PARE
"Needed to bring you up-to-date on the status of the remaining claim on this file.
"The mother of the deceased, BELINDA MARIE SZTRAKY, has retained Attorney, Glen W. Morgan of Beaumont.

"All efforts to settle have been unfruitful as Mr. Morgan feels Mrs. Sztrakey [sic] should be compensated for the loss of companionship and affection of her daughter. Our last settlement offer was $20,000.00. Mr. Morgan has filed suit seeking $500,000.00 actual damages and $250,000.00 exemplory [sic] damages.

"I will keep you informed as events evolve.

"Cordially,

"_____
"GERRI TOWNS
"Senior Claim Representative
"GT:sj"

This letter was admitted into evidence and read before the jury. Therefore, on November 19, 1981, Towns had actual knowledge that a suit had been filed, seeking $500,000.00 in actual damages and $250,000.00 in exemplary damages.

Towns conceded that after receipt of the letter from Morgan, containing the undated Plaintiff's Original Petition, she did in fact fail to ask Morgan for a certified copy of the petition, the file number or the filing date. She further conceded that she failed to make any inquiries of either Morgan or Pare or Melancon concerning the truth or the falsity of the letter from Morgan.

Later, when asked about Form 158L, she acknowledged that it was part of Pare's policy. After she had read into the record the first textual paragraph of Form 158L, she was asked what the meaning of that paragraph was. She replied:

"A It states as respects the B.I. and P.D. liability coverages unless the company is prejudiced by the insured's failure to comply with their requirement any provision of the policy regarding the insured to give notice of action, occurrence or loss or requiring the insured to forward anything or other legal process shall not bar liability under this policy. I have never worked with that particular paragraph. It's not real clear to me."

Nevertheless, Allstate let the matter go to default against Melancon in February, 1982, and later against Pare.

Towns testified unequivocally that Allstate had all the actual notice of the accident and death itself that was required under the policy and that the accident was investigated thoroughly as a liability claim. She also stated that there was no problem with respect to the insured, Pare, having cooperated fully as well as providing any information necessary with regard to the occurrence.

The letter of December 9, 1981, Plaintiff's Exhibit No. 19, was also read before the jury. Apparently, at least Aetna was attempting to make Mark Melancon feel as though he should say "Aetna, I'm glad I met ya!", one of their current television advertisements. We sanguinely overrule Point two. *Garza v. Alviar, supra; In re King's Estate, supra;* Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error," *38 Tex.L.Rev. 361* (1960); Garwood, "The Question of Insufficient Evidence on Appeal," *30 Tex.L.Rev. 803* (1952).

AFFIRMED.

BURGESS, J., not participating.