15 F.3d 1249
 In re TEXAS EASTERN TRANSMISSION CORP. PCB CONTAMINATION
INSURANCE COVERAGE LITIGATION.
The FIDELITY & CASUALTY CO. OF NEW YORK
v.
The TEXAS EASTERN TRANSMISSION CORP.
ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES, LTD.;
National Surety Corporation
v.
TEXAS EASTERN TRANSMISSION CORPORATION; Fidelity & Casualty
Insurance Company of New York; Certain Underwriters at
Lloyds of London, Including the Insurance Company of
Ireland; Aetna Casualty and Surety Company; American Home
Assurance Company; Boston Old Colony Insurance Company;
Continental Casualty Insurance Company; First State
Insurance Company; Highlands Insurance Company; The Home
Insurance Company; Insurance Company of North America;
Insurance Company of the State of Pennsylvania;
International Insurance Company; Lexington Insurance
Company; Midland Insurance Company; Mutual Marine
Insurance Company; Prudential Reinsurance Company; Ranger
Insurance Company; Republic Insurance Company; Stonewall
Insurance Company; Pennsylvania Insurance Guaranty
Association; United States of America; United States
Environmental Protection Agency.
TEXAS EASTERN TRANSMISSION CORPORATION
v.
FIDELITY AND CASUALTY COMPANY OF NEW YORK; Associated
Electric & Gas Insurance Services, Ltd.; Aetna Casualty and
Surety Company; American Home Assurance Company, a/k/a
American Home Insurance Company; Boston Old Colony
Insurance Company; Cigna Insurance Company; Continental
Casualty Company; Employers Mutual Casualty Company; First
State Insurance Company; Highlands Insurance Company; The
Home Insurance Company; The Insurance Company of North
America; Insurance Company of the State of Pennsylvania;
International Insurance Company; Lexington Insurance
Company; Midland Insurance Company; National Surety
Corporation; Prudential Reinsurance Company; Ranger
Insurance Company; Republic Insurance Company; Stonewall
Insurance Company; United States Fire Insurance Company;
Certain Underwriters at Lloyd's, London and Certain London
Market Insurance Companies
Texas Eastern Transmission Corporation, Appellant.
 No. 92-1638.
 United States Court of Appeals,
Third Circuit.
 Argued April 7, 1993.
Decided Jan. 10, 1994.
 
 Peter J. Nickles (argued), Coleman S. Hicks, Covington & Burling, Washington, DC, Charles Alan Wright, Austin, TX, for appellant Texas Eastern Transmission Corporation.
 Leonard L. Rivkin, John L. Rivkin, Erica B. Garay, Rivkin, Radler & Kremer, Uniondale, NY, John C. Sullivan, Manta & Welge, Philadelphia, PA, for appellees Associated Elec. & Gas Insurance Services, Ltd. and National Surety Corporation.
 John Mattioni, Mattioni, Mattioni & Mattioni, Philadelphia, PA, Margaret H. Warner, Lawrence E. Carr, Jr., Peter K. Tompa, William J. Carter, Carr, Goodson & Lee, Washington, DC, for appellees Fidelity & Casualty Company of New York and Boston Old Colony Insurance Company.
 Richard M. Shusterman, Regina B. Mapes, White & Williams, Philadelphia, PA, for appellee Insurance Company of North America
 Edward Zampino, Victor C. Harwood, III, Brian J. Coyle, Harwood Lloyd, Hackensack, NJ, Edward M. Dunham, Jr., Miller, Dunham, Doering & Munson, Philadelphia, PA, for appellee Aetna Casualty & Surety Company.
 Marjorie H. Mintzer, Robin S. Einbinder, Sheft & Sheft, New York, NY, Mitchell S. Pinsly, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for appellees American Home Assurance Company, Highland Insurance Group, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, Ranger Insurance Company, Republic Insurance Company, and Stonewall Underwriters, Inc.
 Stephen Sonderby, Jody Pucel, Haskell & Perrin, Chicago, IL, for appellee Continental Casualty Company.
 Ignatius J. Melito, Barry S. Bendetowies, Siff, Rosen, & Parker, P.C., New York, NY, for appellee First State Insurance Company.
 David Richman, Colleen Connelly, Pepper, Hamilton & Scheetz, Philadelphia, PA, for appellee Home Insurance Company.
 Kevin E. Wolff, Christopher L. Musmanno, Lorraine M. Armenti, McElroy, Deutsch & Mulvaney, Morristown, NJ, Thomas C. DeLorenzo, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for appellees International Insurance Company and United States Fire Insurance Company.
 Michael J. Merlo, Karen L. Douglas, Michael R. Gregg, Merlo, Chapello & Douglas, Ltd., Chicago, IL, for appellee Prudential Reinsurance Company.
 Lise Luborsky, Joseph M. Hankins, Britt, Hankins, Schaible & Moughan, Philadelphia, PA, for appellee Pennsylvania Insurance Guaranty Association.
 Wayne Partenheimer, Law Offices of David L. Rohde, Philadelphia, PA, K. Thomas Shahriari, Mitchell A. Stearn, Gilberg & Kurent, Washington, DC for appellee National Surety Corporation.
 Mary Ann D'Amato (argued), Robert M. Flannery, Mendes & Mount, New York, NY, for appellee Certain London Market Insurance Companies and Insurance Company of Ireland.
 Dan Morales, Atty. Gen., Esther L. Hajdar, Deputy Appellate Coordinator, Office of the Atty. Gen. of Texas, Austin, TX, for amicus appellant State of Texas.
 Thomas W. Brunner, Robert B. Bell, Nancy J. Lemay, Wiley, Rein & Fielding, Washington, DC, for amicus appellee Insurance Environmental Litigation Association.
 Before: MANSMANN, ALITO and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 Preliminary Note
 
 1
 Three cases filed in three courts were consolidated for trial in the district court from whose combined judgments these appeals have been taken at No. 92-1638. This opinion addresses only one facet of these cases--the liability of Texas Eastern Transmission Corp. as adjudicated by the district court in Fidelity & Casualty Co. of New York v. The Texas Eastern Transmission Corp., (hereinafter the "F & C" action) originally filed in the Northern District of Texas, Texas Eastern Transmission Corp. v. Fidelity and Casualty Co. of New York et al., (hereinafter the "Texas Eastern " action) originally filed in a Texas state court and later removed to the Southern District of Texas, and Associated Electric & Gas Insurance Services, Ltd., et al. v. Texas Eastern Transmission Corp. et al. (hereinafter the "AEGIS " action) filed in the Eastern District of Pennsylvania. All three cases were later assigned by the Multi-District Litigation Panel to the district court below.
 
 
 2
 On April 7, 1993, we heard argument on the appeal of Texas Eastern Transmission Company from the judgment of the district court, in a multi-district litigation, declaring that Texas Eastern's insurance carriers (the "Carriers") were not liable for damages arising out of Texas Eastern's discharge of PCB-laden oils into the environment. Our unreported opinion, affirming the district court's judgment, was filed on May 28, 1993, 995 F.2d 219. We vacated that opinion on January 6, 1994. This opinion in effect reinstates the discussion on liability set forth in our previous not-for-publication opinion.
 
 
 3
 We deem it necessary to write separate opinions because Texas Eastern Transmission Corp. petitioned for rehearing in only two of the cases--Texas Eastern and AEGIS--and only on the subject matter jurisdiction issue. We ordered panel rehearing in those two cases only, stayed our mandate in all three cases and ordered oral re-argument of the question of subject matter jurisdiction in the two cases. Our companion opinion discusses subject matter jurisdiction in the cases that were reheard and also the question of jurisdiction in F & C because jurisdiction in that case was indirectly put to question in the rehearing arguments. This opinion addresses once again the subject of Texas Eastern liability in all three cases.
 
 
 4
 Texas Eastern Transmission Corporation claimed that its comprehensive general liability insurance carriers (the "Carriers") must pay for damages associated with the cost of removing PCBs that present a danger of polluting the property of third parties. The district court granted summary judgment against Texas Eastern on the theory that Texas Eastern provided prejudicially late notice of its claim to the Carriers. We will affirm in the case of Fidelity Casualty Co. of New York v. Texas Eastern Transmission Co., D.C.Civ. No. 88-05039 (E.D.Pa.).
 
 I.
 
 5
 The relevant facts, which appear in great detail in the district court's opinion, may be summarized as follows.
 
 
 6
 Until the early 1970s, Texas Eastern used a toxic, PCB-laden lubricant in compressor stations along a pipeline that stretched 9,500 miles, from Texas to New York. The lubricant co-mingled with other toxic fluids in the pipeline, and Texas Eastern discharged those fluids into the environment, either by venting them into the air during start-up or shut-down, or by discharging them into earthen pits, which occasionally overflowed. Texas Eastern would also occasionally spray fluids from the pits to kill weeds or to control dust.
 
 
 7
 As early as 1972, the lubricant's manufacturer informed Texas Eastern that the lubricant contained toxic PCBs. Throughout the late 1970s and early 1980s, Texas Eastern became increasingly aware that PCBs were entering the environment via the pipeline fluid. The district court determined that, taking all inferences in favor of Texas Eastern, a genuine issue of material fact existed as to whether Texas Eastern knew between 1970 and December 1986 that PCBs were present in the pipeline fluid and that the PCBs could migrate, via the pipeline fluid, onto the property of third parties. That issue was critical because such knowledge would trigger Texas Eastern's obligation to notify Carriers of an insurable "occurrence" under the relevant insurance policies.
 
 
 8
 Employing the correct summary judgment standard, the district court determined that although a rational factfinder could conclude that Texas Eastern knew PCBs were migrating to the property of third parties as early as 1972, December of 1986 was the latest possible date a jury could conclude that Texas Eastern discovered that PCBs were migrating onto the property of third parties. The district court based its determination in part on Texas Eastern's concession that in December, 1986, a preliminary report commissioned by Texas Eastern gave it reason to know that PCBs were migrating off-site.
 
 
 9
 As we review in more detail below, between December, 1986, and August, 1987, Texas Eastern entered into at least one consent decree and negotiated in earnest with the Environmental Protection Agency. After some months of negotiation with the EPA, Texas Eastern notified the Carriers of a potential occurrence giving rise to a claim. The cost of clean-up is now estimated at $750 million.
 
 
 10
 Fidelity and Casualty, Texas Eastern's primary carrier, brought its case in the Northern District of Texas premised on diversity jurisdiction, seeking a declaratory judgment that it was not liable under its policy for the claims. Associated Electric & Gas Insurance Services, Ltd. ("AEGIS") and National Surety Corporation, other carriers of Texas Eastern, brought a second suit against Texas Eastern and all of the remaining carriers in the Eastern District of Pennsylvania. Federal subject matter jurisdiction in the AEGIS action was premised on the Foreign Sovereign Immunities Act. Texas Eastern brought a third state-court action against all the carriers, later removed to the Southern District of Texas also on the basis of the Immunities Act. Because we address whether Immunities Act jurisdiction was proper in a separate opinion, that issue will not be discussed here.
 
 
 11
 In an extensive opinion, the district court determined that summary judgment should be entered against Texas Eastern on the ground that its delay in providing notice to the Carriers was unreasonable and prejudicial as a matter of law. In re Texas Eastern Transmission Corporation PCB Contamination Insurance Coverage Litigation, No. MDL-764, 1992 WL 227847 (E.D.Pa. July 9, 1992).
 
 
 12
 We exercise plenary review of the district court's grant of summary judgment, applying "the same test the district court should have used initially." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). See generally Celotex Corp. v. Cartrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 13
 The district court clearly had diversity jurisdiction over one of the three cases that constitute this multi-district litigation. Fidelity & Cas. Co. v. Texas Eastern. The other two cases, Associated Electric & Gas Ms. Svs. v. Texas Eastern, No. 88-021267 ("AEGIS ") and Texas Eastern v. Fidelity & Cas. Co., No. 88-05707, are premised on jurisdiction under the Foreign Sovereign Immunities Act, and they are the subject of an opinion filed contemporaneously with this one. We have jurisdiction of a final decision of the district court. 28 U.S.C. Sec. 1291.
 
 II.
 
 14
 In determining that late notice relieved the Carriers[1] of any obligation under the contracts, the district court reached three central conclusions. First, Texas Eastern's duty to inform the carriers of an "occurrence" accrued not later than December of 1986. Second, Texas Eastern provided unreasonably late notice to the Carriers eight or nine months later, in August of 1987. Third, the unreasonably late notice prejudiced the Carriers. Although Texas Eastern challenges all three conclusions, only the third, regarding prejudice, merits some discussion.
 
 A.
 
 15
 To predict the standard of prejudice applied under Texas law, we must first review the relevant line of Texas cases. The Texas Supreme Court long adhered to the rule that an insured's delay in providing notice relieved a carrier of liability under the policy, even in the harsh case when the carrier stipulated that it had not suffered any prejudice at all. See Members Mutual Ins. Co. v. Cutaia, 476 S.W.2d 278 (Tex.1972) (stating harsh rule).
 
 
 16
 In 1973, the Texas State Board of Insurance ordered that the following Amendatory Endorsement be attached to general liability policies:
 
 
 17
 As respects bodily injury liability coverage and property damage liability coverage, unless the company is prejudiced by the insured's failure to comply with the requirement, any provision of this policy requiring the insured to give notice of action, occurrence or loss, or requiring the insured to forward demands, notices, summons or other legal process, shall not bar liability under this policy.
 
 
 18
 See R. at 869-72 (Order of Insurance Board).
 
 
 19
 Although "there is a paucity of authority explicating what, within the purview of the endorsement, would constitute prejudice sufficient to relieve an insurer of liability," Kimble v. Aetna Casualty & Surety Co., 767 S.W.2d 846, 850 (Tex.App.Ct.1989), at least one Texas appellate court has stated clearly that prejudice results to the insurer by "the change in its position " brought about by an insured's failure to notify. Members Ins. Co. v. Branscum, 803 S.W.2d 462, 466 (Tex.Ct.App.1991) (emphasis added) (citing Kimble, 767 S.W.2d at 851). Our task, therefore, is to determine what constitutes prejudice under Texas law.
 
 
 20
 While we find helpful the change-in-position elaboration on the legal meaning of prejudice, the question remains how substantial that change in position must be before a court can conclude that, as a matter of law, a carrier has suffered prejudice. In some states, for example, courts have imposed a "substantial prejudice" standard, which requires a demonstration that an insurer could have either defeated a claim or settled for a smaller sum than the sum for which the insured ultimately settled. Insurance Co. of Pa. v. Associated Int'l Ins. Co., 922 F.2d 516, 524 (9th Cir.1990) (applying California law). To determine the extent of harm sufficient to constitute prejudice under Texas law, we find instructive the facts of several Texas cases.
 
 
 21
 In a number of cases, Texas courts have held that notice to a carrier after the entry of a default judgment has become final constitutes prejudice, as a matter of law, sufficient to defeat the carrier's liability under a policy. See, e.g., Ratcliff v. National County Mut. Fire Ins. Co., 735 S.W.2d 955, 957 (Tex.Ct.App.1987). Compare Allstate Ins. Co. v. Pare, 688 S.W.2d 680 (Tex.Ct.App.1984) (no prejudice where insurer received papers before default and had negotiated for settlement prior to default). Notably, the court in Ratcliff did not require the carrier to show that it would have or could have defended the suit successfully or reached a better settlement. We note also that in Kimble the court determined that prejudice existed notwithstanding that the carrier learned of the suit before the judgment became final. 767 S.W.2d at 850. Observing that opening of the judgment was uncertain, the court did not assign any burden to the carrier to show that it would have litigated the case or to explain why it did not enter the litigation. Id. at 850-51. Similarly, in Branscum, the court held that prejudice resulted when a carrier learned of a final default judgment, notwithstanding that the carrier had had actual knowledge of the underlying accident, had engaged in settlement negotiations, and had known of an impending suit. 803 S.W.2d at 463-64.
 
 
 22
 These cases demonstrate that the Texas courts do not utilize a "substantial prejudice" standard and do not impose on carriers the burden of explaining non-action such as failure to obtain papers in an impending suit. Indeed, the court in Branscum stated unequivocally that "application of a 'substantial' prejudice standard is erroneous." Branscum, 803 S.W.2d at 467.
 
 
 23
 Upon review of the Texas caselaw discussed above, we predict that the Texas courts would apply a standard of prejudice somewhat lower than "substantial prejudice" and closer to a concept of permitting carriers to deny coverage when there is evidence of change in position adverse to a carrier's interest. See Branscum, 803 S.W.2d at 466; Kimble, 767 S.W.2d at 851. Although the change must obviously be material under this standard of prejudice, the carrier need not show that the change is irreversible in order to demonstrate that prejudice has resulted. E.g., Kimble, 767 S.W.2d at 851 (holding of prejudice, notwithstanding carrier's rejection of option to petition to vacate default). With these decisions in mind, we turn now to a review of the district court's conclusion.
 
 B.
 
 24
 In concluding that the Carriers were prejudiced by Texas Eastern's delay of at least eight months in providing notice, the district court assumed without deciding that prejudice was a necessary element to the Carrier's defense of late notice. The district court then examined the events that the parties do not dispute took place between December, 1986 (the latest date that the duty to notify accrued), and late August, 1987 (the date Texas Eastern actually gave notice to the Carriers).
 
 
 25
 On December 15, 1986, several days after it had received from its broker a comprehensive list of carriers and notice provisions, Texas Eastern proposed a cleanup plan to the EPA. Op. at 149. (Four days later, Texas Eastern met with EPA officials to discuss the establishment of a framework for future discussions on remediating contaminated on-site areas on Texas Eastern's system. R. at 1036-37. Within a month, Texas Eastern had furnished EPA with a summary of a preliminary environmental report and a "Summary of Dioxin Sampling and Analysis." R. at 1036, p 375-76.)[2] As the district court noted:
 
 
 26
 By this time, Texas Eastern was committed to remediating the PCB contamination in its unlined earthen pits and the only material dispute between Texas Eastern and EPA was the extent of the cleanup and the form of the agreement which would be required.
 
 
 27
 Op. at 149.
 
 
 28
 In February of 1987, at approximately the same time that the Houston Chronicle published an article detailing Texas Eastern's PCB-related problems, Texas Eastern considered giving notice, but did not. Op. at 150-51. On March 17, Texas Eastern testified before a United States Senate Subcommittee regarding its PCB problem and the status of its already ongoing settlement discussions with EPA. And in April, settlement negotiations became intensive, with EPA insisting that cleanup levels be based on EPA's "risk assessments" and with EPA demanding that Texas Eastern consider off-site contamination and enter into formal negotiations to discuss specific cleanup demands. Op. at 151-52. It was at this point that Texas Eastern entered into a consent decree with the Commonwealth of Pennsylvania. Op. at 172. (That decree contained numerous stipulations of fact, and it established testing and monitoring methodologies and schedules that Texas Eastern would follow. R. at 4968.)
 
 
 29
 By mid-August, significant and extensive negotiations had already taken place, as indicated by the contents of a letter dated August 18 from Carol Dinkins, Texas Eastern's negotiator, to EPA. Op. at 152. The letter summarizes fifteen major issues for inclusion in a comprehensive settlement, among them Texas Eastern's proposal to pay substantial civil penalties and oversight costs. R. at 808-809. (The letter also discloses Texas Eastern's bargaining position: "Texas Eastern proposes to undertake a far greater commitment of work at many more sites than EPA has ever seen any party voluntarily step forward to work out...." R. at 809.) A few days later, Texas Eastern mailed its notice of claim, dated August 19, 1987, to the Carriers.
 
 
 30
 With respect to these events, the district court held:
 
 
 31
 By the time Texas Eastern gave notice, remedial efforts, testing and monitoring had begun, and schedules and methodologies to characterize the sites had been established. Most importantly, Texas Eastern had already presented to EPA its proposed settlement terms, and thus completely destroyed any meaningful opportunity for the Carriers to shape negotiations with EPA. The record makes it abundantly clear that Texas Eastern never wanted the Carriers to interfere with what was a carefully negotiated settlement with EPA and waited until the settlement was substantially agreed upon before providing any notice to the Carriers.
 
 
 32
 Op. at 172-73.
 
 
 33
 Texas Eastern does not dispute that, by August 19, 1987, the Carriers had lost an opportunity to participate initially in "remedial efforts, testing, ... monitoring, and [establishment of] schedules and methodologies." Op. at 172-73. Indeed, Texas Eastern's assertion that insurers do not generally get involved in environmental investigations and negotiations is without record support. See Br. for Appellant at 31; Rep.Br. for Appellant at 3 n. 3. Nor does Texas Eastern dispute that, as of August 18, 1987, at least one day before notice was provided, Texas Eastern had already disclosed its bargaining position to EPA, or, in the parlance of poker players, tipped its hand by, for example, proposing to pay a substantial civil penalty and to undertake a voluntary cleanup far greater than EPA had ever seen. Under the law of Texas, these undisputed facts alone justify the district court's holding because they indicate prejudice resulting from a material change in the Carriers' bargaining position. See Branscum, 803 S.W.2d at 466. Because the above changes resulted in prejudice, we need not address the Carriers' additional arguments that prejudice resulted from Texas Eastern's waiver of rights against the United States and from Texas Eastern's renewal of its insurance contracts prior to notifying the Carriers of the claim.
 
 C.
 
 34
 Because prejudice to the carriers flows from the ex parte participation of Texas Eastern in its field investigations and in its negotiations, it follows that Texas Eastern's disputations that "there was no 'done deal' between Texas Eastern and EPA in August, 1987" are not persuasive. The district court did not say that the matter was a "done deal," but that "the matter was for all intents and purposes ... a 'done deal.' " Op. at 170 (emphasis added). Indeed, most, if not all, of the points in the August 18 letter found their way, in some form or other, into the final consent decree. Compare R. at 805 (Dinkins's letter) with R. at 557 (consent decree).
 
 
 35
 Moreover, Texas Eastern's assertions that the Carriers had the option of entering the negotiations after August 18, 1987, are immaterial to the issue of whether prejudice occurred prior to that date through a material change in position. In Kimble, a carrier chose not to enter litigation, even though there remained time to do so. 767 S.W.2d at 846. As the court in Branscum noted:
 
 
 36
 The Kimble court held that prejudice results to the insurer by the change in its position brought about by the insured's failure to forward the suit papers until after the default. Prejudice results even though the option to file a new trial is still available to the insurer. Kimble, 767 S.W.2d at 851.
 
 
 37
 Branscum, 803 S.W.2d at 466 (emphasis added). By analogy, prejudice resulted here even though the option to enter negotiations was still available to the Carriers.
 
 
 38
 Texas Eastern submits one further challenge to the district court's determination of prejudice, namely, that the Carriers must show that they would have entered negotiations earlier and that they could have altered the outcome. This challenge, however, seeks to apply the "substantial prejudice" standard to the Carriers, whereas the tone and tenor of extant Texas caselaw indicates that the application of that standard would be erroneous.[3] See, e.g., Branscum, 803 S.W.2d at 467.
 
 D.
 
 39
 Because we have determined that the district court correctly concluded that the carriers were prejudiced, we need not address the remaining contentions of Texas Eastern.
 
 III.
 
 40
 For the foregoing reasons, we will affirm the judgment of the district court as to liability of Texas Eastern in all three cases.
 
 ALITO, Circuit Judge, dissenting in part:
 
 41
 In my dissent from the majority's separate opinion concerning the jurisdictional issues presented in this appeal, I explain why I believe that the district court lacked jurisdiction with respect to two of three actions that were before it: the Texas Eastern and AEGIS actions. That dissent also addresses the question whether TETCO's excess insurers are properly parties in the third action: the F & C action. In this opinion, I explain why I believe that the district court's grant of summary judgment in favor of F & C in the F & C action should be partially reversed.
 
 
 42
 The F & C action involved the availability of coverage for TETCO's PCB-related problems under a series of policies that were in effect from 1961 through 1988. All of these policies generally required TETCO to notify F & C "as soon as practicable" after becoming aware of an "occurrence" that appeared likely to trigger coverage. The policies effective on or after May 1, 1973, provide that F & C could deny coverage based on lack of timely notice only if it suffered some degree of actual prejudice. By contrast, under the earlier policies, lack of timely notice allowed F & C to deny coverage without any inquiry into prejudice. The policies in effect from July 1, 1970, through January 1, 1981, also contain a clause excluding coverage for damage caused by pollution unless the pollution was "sudden and accidental."[1] The earlier and later policies do not contain this pollution exclusion clause.
 
 
 43
 Because TETCO's policies with F & C provided coverage for damage to the property of others but not to TETCO's own property, the notice requirement meant, as the district court concluded, that TETCO was obligated to notify its insurers promptly upon learning that PCBs were migrating beyond its own property lines, since off-site migration was the "occurrence" likely to produce claims potentially covered by the policies.[2] The district court held that this notice obligation accrued no later than December 1986--the month during which TETCO received a report documenting off-site PCB migration. But even if this obligation did not arise until as late as May 1987--when the EPA demanded cleanup measures aimed at preventing additional off-site migration--TETCO's notice in August 1987 could not reasonably be regarded as having been given "as soon as practicable." TETCO is certainly capable of moving faster than this when its own interests are at stake. Thus, I agree with the district court and the panel majority that TETCO did not comply with its notice obligation. On this basis, I agree that the district court properly granted summary judgment in favor of F & C with respect to those claims falling under the earlier policies that did not require a showing of actual prejudice.
 
 
 44
 With respect to claims under the more recent policies, however, Texas law allowed coverage to be denied because of late notice only if the insurers suffered actual prejudice. See Maj. Op. # 2 at 1253-54. Unlike the majority, I am convinced that summary judgment for the insurers on the issue of actual prejudice was improper. The majority correctly observes that TETCO's late notice deprived the insurers of the opportunity to participate in the settlement negotiations between TETCO and the EPA that took place during the summer of 1987. I wholeheartedly agree that these were important discussions and that the insurers suffered prejudice if, given the opportunity, the insurers would have participated in or at least seriously considered participating in these discussions. But what if the insurers would not have participated in these discussions or even seriously considered doing so? Could it then be said that they suffered prejudice in any meaningful sense? I do not think so.
 
 
 45
 Before holding that TETCO's claims are barred because the insurers were prejudiced, I think we should require at least some support in the summary judgment record indicating that the insurers would or realistically might have availed themselves of the supposedly valuable opportunity that they lost. There is, however, no such support--no affidavits or other support concerning (a) what the insurers would have done in this case had they received prompt notice, (b) these insurers' usual practices regarding involvement in EPA settlement negotiations in cases such as this, or (c) prevailing practices in the insurance industry as a whole in comparable cases.
 
 
 46
 In this case, although the insurers' potential liability was huge they had many promising legal defenses. Under these circumstances, it may well be that the insurers, if given prompt notice, would have summarily concluded that their best strategy was to let TETCO negotiate on its own and then to litigate any subsequent claims for coverage. This is precisely the strategy that the insurers did adopt after they received TETCO's notice. Without anything in the summary judgment record to show that the insurers would not have taken this approach had they received notice more promptly, I do not think that summary judgment on this issue was proper.
 
 
 47
 While I cannot agree that the insurers were entitled to summary judgment on the issue of actual prejudice, I agree that they were entitled to summary judgment with respect to some of the policies on an alternative ground cited by the district court: the presence of a pollution exclusion clause in some of the policies. According to the district court, summary judgment against TETCO was proper as to these policies because the damage caused by off-site PCB migration was not "sudden and accidental." For essentially the reasons given by the district court,[3] I believe that this alternative holding was correct. Accordingly, I would affirm the district court's grant of summary judgment in favor of F & C as to the policies containing both an actual prejudice requirement and this pollution exclusion clause.
 
 
 48
 In sum, I would affirm in part and vacate in part the grant of summary judgment in favor of F & C in the F & C case, and I would remand that case to the district court for further proceedings.
 
 
 
 [1]
 Although we decide here only the diversity case involving Fidelity and Casualty, D.C.Civ.No. 88-05039, the Carriers submitted a joint brief, and so we refer to Fidelity & Casualty's position generically as the Carriers' position
 
 
 [2]
 Here and in the following paragraphs, we have noted parenthetically specifics to which the district court did not refer expressly
 
 
 [3]
 The position of the dissent, that the carriers must demonstrate that they would have entered into negotiations in order to demonstrate prejudice from late notice, see dissent at 1257, does not comport with our reading of the Texas caselaw. Moreover, the dissent's approach would inappropriately render a notice defense unavailable under Texas law any time a carrier also asserted other bona fide defenses to coverage
 For example, a carrier might refuse to defend against a battery claim on the grounds that a policy clearly limited the carrier's obligation to the defense of negligence. That carrier would never be able to meet the dissent's "actual prejudice" standard, no matter how egregious the lateness of notice.
 
 
 [1]
 The exclusion clause reads:
 This policy does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
 
 
 [2]
 Because of my conclusion that the merits of the coverage dispute between TETCO and its excess insurance carriers were not properly before the district court, I need only consider the effect of TETCO's late notice on F & C. However, since the majority considers the question of late notice with respect to the insurance carriers as a group, and because I agree with the majority that such treatment is appropriate, I write in terms of the effect of late notice on all insurers
 
 
 [3]
 See, MDL No. 764, 1992 WL 227847, at * 49-54, 1992 U.S.Dist. LEXIS 9665, at * 166-84 (E.D.Pa. July 9, 1992)