CAPITOL BANK AND TRUST COMPANY *vs.* MARILYN RICHMAN,
trustee.

Suffolk.   February 7, 1985. — March 25, 1985.

Present: GREANEY, C.J., PERRETTA, & SMITH, JJ.

*Evidence*, Best and secondary, Existence of document, Hearsay. *Guaranty.*
   *Bank and Banking.*

At the trial of an action by a bank to recover a loan, during which the exist-
   ence of a guaranty signed by the defendant was in issue, evidence
   warranted the judge's finding that the defendant had signed the guaranty,
   and secondary evidence to establish its terms was properly admitted.
   [519-522]
Any error in the admission of certain hearsay evidence at the trial of a civil
   action was harmless in light of statements in the judge's memorandum
   of decision showing that he had assigned relatively little weight to this
   evidence. [522-523]
The judge in an action by a bank seeking recovery on promissory notes did
   not abuse his discretion in denying the defendant's posttrial motion for
   examination of certain evidence. [523]
Evidence at the trial of an action by a bank seeking recovery on promissory
   notes supported the judge's finding that a second mortgage on residential
   property given when a loan was refinanced some six weeks after it had
   been made was not the "primary security" for the loan and that, con-
   sequently, acceptance of the mortgage by the bank did not violate G. L.
   c. 172, § 48 (A) (*b*). [523-524]

CIVIL ACTION commenced in the Superior Court on January
10, 1978.

The case was heard by *James P. Lynch*, J.

*James R. Rosencranz* for the defendant.

*James R. DeGiacomo* (*Anne H. Stossel & John W. Gahan,
III*, with him) for the plaintiff.

GREANEY, C.J. By its complaint, the bank sought to recover
money loaned to the defendant, Marilyn Richman, as trustee
of the Mar-Rich and Marjack Realty trusts. The case was heard

by a judge of the Superior Court sitting without a jury who filed a comprehensive and detailed memorandum of decision. A judgment entered ordering Marilyn to pay the bank $150,972.98 (as trustee of Mar-Rich), and $128,767.41 (as trustee of Marjack), together with attorney's fees and costs. On appeal, Marilyn argues that the judge erred (1) in finding that she, as trustee of Mar-Rich, had signed a guaranty of the bank's loans; (2) in admitting in evidence a checklist of documents prepared for the loan closing by the bank's attorney and in denying her posttrial motion to test the authenticity of the checklist; and (3) in concluding that the bank had not violated banking laws which prohibit the taking of a second mortgage on residential property as "primary security" for a business loan. We affirm the judgment.

The following facts found by the judge describe the intricate financing arrangements underlying the bank's loans. Marilyn is the sole trustee of two Massachusetts business trusts, Mar-Rich, created on July 31, 1975, and Marjack, created on September 21, 1966. Marjack is the owner of a single family dwelling located at 98 Craig Street, Milton, occupied by Marilyn. Mar-Rich is the record owner of real estate located at 115-117 Freeport Street, Dorchester. This property was leased (from 1975 onward) to Sandy Plumbing Company (Sandy), a Massachusetts corporation which conducted business primarily as a plumbing subcontractor. Sandy was founded by Marilyn's father. Sandy also employed Harold Richman, who at the time of Marilyn's father's death was president and treasurer of the business. Marilyn, herself, worked as secretary-bookkeeper in the business and was an officer of the corporation.

In January, 1976, Harold approached the bank requesting a loan of $125,000 to pay Sandy's existing debts and to provide working capital. The loan was to be made in two phases: (1) $75,000 to be secured by a first mortgage on the Freeport Street property, and (2) a $50,000 line of credit to be secured by a pledge of all of Sandy's accounts receivable and a chattel mortgage on Sandy's inventory and other fixed assets. The bank's executive committee initially tabled Harold's request for the loan. However, after Harold renewed the request in February, 1976, the bank approved the $50,000 line of credit

phase of the loan. As collateral, the bank required security interests in Sandy's accounts receivable, inventory, and other fixed assets, the personal guaranties of Harold and Marilyn and the guaranties of the two trusts. On February 19, 1976, the bank lent the $50,000 directly to Marjack, which simultaneously lent it to Sandy. Marilyn, as trustee of Marjack, executed and delivered a $50,000 demand promissory note to the bank. Sandy executed an unlimited guaranty of Marjack's obligations as well as security and pledge agreements assigning to the bank all of Sandy's inventory, accounts receivable, and other fixed assets. Marilyn and Harold executed personal guaranties and Marilyn, as trustee of the two trusts, executed guaranties for the trusts.

On March 24, 1976, the bank approved the $75,000 phase of the loan and the refinancing of the February 19th Marjack loan. The $75,000 loan was to be secured by a first mortgage on the Freeport Street property held by Mar-Rich, individual guaranties of Marilyn and Harold, assignments of the note held by Mar-Rich from Sandy and the security interest held by Mar-Rich in Sandy's assets, and assignment of a life insurance policy on Harold's life. The refinancing of the $50,000 Marjack loan involved the bank's receipt of additional security in the form of a second mortgage on the Milton property, an assignment of the $50,000 note given Marjack by Sandy, a general assignment of all of Sandy's assets, and guaranties by Harold and Marilyn of the Marjack note. The closing of the $75,000 Mar-Rich loan and the $50,000 Marjack refinancing were held on April 1, 1976, at the bank. In attendance at the closing were Harold, Marilyn, their attorney, various bank officials, and the bank's attorney, Mr. Marvin Kushner. The $75,000 was lent directly to Mar-Rich, which simultaneously lent it to Sandy. In connection with this loan Marilyn, as trustee of Mar-Rich, executed and delivered to the bank a promissory note for $75,000 and the documents described in the margin.[1]

---

[1] The following documents comprised security for the $75,000 Mar-Rich loan: (a) a first mortgage by Mar-Rich on the Freeport Street property; (b) an unlimited guaranty by Sandy of amounts owed by Mar-Rich; (c) personal guaranties of Marilyn and Harold; (d) assignments by Mar-Rich of Sandy's

In connection with the refinancing of the Marjack loan, Marilyn, as trustee of Marjack, executed and delivered a new promissory note for $50,000 and the documents described in the margin.[2]

All the documents for both April 1st loans were prepared by the bank's attorney, Mr. Marvin Kushner. Prior to the closing, Mr. Kushner had also prepared guaranties, dated April 1st, securing the obligations of Sandy by both Mar-Rich and Marjack. However, in reviewing the bank's loan file before the closing Mr. Kushner noted that these guaranties already existed for the February 19th closing in the same form he had prepared. Therefore, he did not reexecute duplicate guaranties. Subsequently, after the commencement of litigation, the bank discovered that it had lost the February 19th Mar-Rich guaranty.

Through August, 1977, the bank received payments on the Mar-Rich and Marjack notes. Late in the summer of 1977, however, Sandy's financial condition deteriorated. Harold requested that the bank extend further credit to Sandy by honoring overdrafts drawn on Sandy's accounts. The bank approved an additional extension of credit and agreed to allow overdrafts of up to $40,000. Sometime in September, 1977, however, when overdrafts exceeded $40,000, the bank refused to honor Sandy's subsequent checks unless its accounts contained sufficient funds to cover them. Sandy never repaid the overdrafts credited on its accounts. Mar-Rich and Marjack also made no payments on their notes after those due in August, 1977. This lawsuit followed.

---

$75,000 note payable to Mar-Rich and of Mar-Rich's security interest in Sandy's assets; (e) an assignment by Mar-Rich of its interest in its lease to Sandy of the Freeport Street property; and (f) a pledge agreement by Mar-Rich in favor of the bank pledging the note and collateral security held by it in Sandy.

[2] The following documents comprised the security for the Marjack refinancing: (1) a second mortgage on the Milton property; (2) an unlimited guaranty by Sandy of all amounts owed by Marjack; (3) personal guaranties of Marilyn and Harold of all amounts owed by Marjack up to $50,000; (d) assignments by Marjack of Sandy's $50,000 note payable to Marjack and of Marjack's security interests in Sandy's assets; and (e) a pledge agreement by Marjack in favor of the bank pledging Sandy's note and the collateral security held by it in Sandy.

1. *The lost Mar-Rich guaranty.* The principal issue on appeal concerns the guaranty of February 19, 1976, by Mar-Rich of Marjack's $50,000 loan. The bank claimed that the guaranty had been lost. Marilyn claimed that she never signed the guaranty. The judge found, as a fact, that Marilyn had signed the guaranty as trustee of Mar-Rich. Marilyn argues that this finding has no support in the evidence. She also maintains that the contents of the guaranty should not have been established by secondary evidence.

The judge's crucial factual findings — that the guaranty existed and that Marilyn had signed it — are to be assessed under the "clearly erroneous" standard set forth in Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). A finding of fact will not be deemed "clearly erroneous" unless the appellate court on the entire evidence is left with the firm conviction that a mistake has been made. See *Building Insp. of Lancaster* v. *Sanderson*, 372 Mass. 157, 161 (1977); *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). In applying the standard, we bear in mind that it is not the appellate court's function to decide factual issues de novo, since it is the primary duty of the trier of fact to appraise and weigh the evidence. *Building Insp. of Lancaster* v. *Sanderson*, 372 Mass. at 161.

We conclude that the evidence warranted the judge's findings. Mr. Marvin Kushner, the bank's attorney, testified that in preparing for the April 1st closing he examined the bank's loan folder which contained the documents from the February 19th closing and that he had seen in that folder a Mar-Rich guaranty executed by Marilyn.[3] Mr. Kushner produced two documents which tended to support his testimony: (1) a copy of a guaranty to be signed at the April 1st closing by Marilyn on behalf of Mar-Rich which he left unexecuted because of the

---

[3] Mr. Kushner's testimony was expressed in terms of his having seen a "similar" guaranty. The context of the testimony leaves no doubt that he was testifying to having seen a Mar-Rich guaranty bearing Marilyn's signature identical to the one he had prepared for the April 1st closing. Mr. Kushner's testimony was so interpreted by the judge and that interpretation was reasonable.

existence of the earlier guaranty, and (2) a checklist of documents for that closing which indicated that he had seen the earlier guaranty and found it sufficient to satisfy the bank's requirement that Mar-Rich execute a guaranty of Marjack's loan. In addition to Mr. Kushner's testimony, there was also extensive testimony that the Mar-Rich guaranty was made an express condition of the loan. This testimony was in turn corroborated by bank documents in the form of executive committee records and loan write-up sheets.[4]

Although Marilyn testified that she had not signed the guaranty, it is manifest from the judge's findings that he rejected her testimony on credibility grounds. The testimony was particularly suspect in view of the number of other documents signed as security for the loan by Marilyn both individually and in her capacity as a trustee. In essence, on the issue of Marilyn's execution of the missing guaranty, the judge chose to credit the testimony of the bank's attorney, corroborated as it was in material detail by circumstantial evidence, instead of the testimony of a debtor in distress. This was the judge's prerogative.[5]

We also conclude that the judge properly considered secondary evidence to prove the contents of the guaranty. It is settled that the original of a written instrument need not be produced if a judge is satisfied that it is lost other than through the serious

---

[4] The intricate and overlapping nature of the security for the loans taken by the bank, as previously described in the facts, see in particular notes 1 and 2, *supra*, adds additional circumstantial support for the bank's position that it required security by means of a Mar-Rich guaranty.

[5] The fact that Mr. Kushner did not authenticate Marilyn's signature on the guaranty is not material. Marilyn did not question authentication. She contended that the disputed guaranty never existed in the first place. A finding that the guaranty was seen with her signature on it was therefore sufficient in the circumstances.

We also reject Marilyn's argument that the bank should be held to a standard of clear and convincing proof to establish the lost guaranty. There was no request made in the trial court for the application of a burden of proof more stringent than the usual fair preponderance of the evidence standard. The issue of an enhanced standard of proof cannot therefore be raised for the first time on appeal. *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 88 (1977).

fault of its proponent. See *Fauci* v. *Mulready*, 337 Mass. 532, 540 (1958); *Old Colony Trust* v. *Shaw*, 348 Mass. 212, 219 (1964); Liacos, Massachusetts Evidence 362, 363 (5th ed. 1981). Once a judge is so satisfied, secondary evidence of any sort can be admitted to prove the contents of the lost instrument. See *Fauci* v. *Mulready, supra; Old Colony Trust* v. *Shaw, supra*. This rule is applicable to all lost instruments, including those which may fall within the ambit of the Statute of Frauds. See Restatement (Second) of Contracts § 137 (1979); 2 Corbin, Contracts § 529 (1950). "[T]here is no kind of written evidence, whether of private contracts or public records, so high or sacred, that its loss cannot be supplied by secondary, and if necessary, by parol, evidence." *Cousins* v. *Cowing*, 23 Pick. 208, 215 (1839).[6]

Here the judge found that the missing Mar-Rich guaranty had been lost by the bank. Since there was no suggestion by Marilyn at trial that such loss occurred through the serious fault of the bank (her contention being that the guaranty never existed), the judge could, and did, properly admit secondary evidence to prove the terms of the guaranty. It does not matter that the guaranty was a document subject to the Statute of Frauds. The judge's finding that the guaranty had in fact been signed by Marilyn resolved that issue. And contrary to Marilyn's contention, it is not required in Massachusetts that the lost document have been in the possession of the person sought to be held liable under the document before secondary evidence can be admitted to prove its contents.[7] The questions concerning

---

[6] For example secondary evidence has been admitted with respect to: missing private contracts, see *Oriental Bank* v. *Haskins*, 3 Met. 332 (1841); *Morrison* v. *Chapin*, 97 Mass. 72 (1867); bonds, see *Eaton* v. *Hall*, 5 Met. 287 (1842); *Loring* v. *Whittemore*, 13 Gray 228 (1859); *Fauci* v. *Mulready, supra*; leases, see *Cooley* v. *Collins*, 186 Mass. 507 (1904); deeds, see *Brigham* v. *Coburn*, 10 Gray 329 (1858); and negotiable instruments, see *Page* v. *Page*, 15 Pick. 368 (1834); *Foster* v. *MacKay*, 7 Met. 531 (1844).

[7] Marilyn cites no Massachusetts authority for her argument that the document has to be in the possession of the debtor before secondary evidence can be admitted. She may be confusing the loss or misplacement of an original document with the destruction of the document by its proponent. In the latter case, there is a presumption that the proponent would not have

the existence of the guaranty and proof of its terms were thus primarily questions of fact for the judge, as the sole trier of fact, and on sufficient evidence were decided against Marilyn.

2. *Evidence of the checklist.* The judge received in evidence a checklist prepared by Mr. Kushner for the April 1st closing. Mr. Kushner testified that a checkmark next to the words "Mar-Rich-Sandy" near the word "[g]uarantee" on the checklist was his shorthand indication that the missing Mar-Rich guaranty had been executed. The checklist was received over a general hearsay objection by Marilyn's counsel, the judge ruling that the checklist was not hearsay, and that, if it was hearsay, it was nevertheless admissible as past recollection recorded or under some other unspecified exception to the hearsay rule. After the conclusion of the trial, Marilyn's counsel moved to have the checklist examined to test "the age of the document, handwriting and markings thereon." The motion was denied. Both the ruling admitting the checklist and the ruling denying the motion to authenticate the document are now challenged.

The checklist was hearsay. It appears very likely that it could have been admitted as past recollection recorded had a proper foundation for that hearsay exception been developed. All the requisites of the foundation were not furnished, perhaps through inadvertence.[8] We cannot perceive any other exception to the hearsay rule which would qualify the checklist.

We need not dwell on the issue, however, because it appears from the memorandum of decision that the judge assigned relatively little weight to the checklist. In his memorandum,

---

destroyed the document unless it contained matter unfavorable to him. Secondary evidence is not admissible until that presumption is overcome. See Liacos, *supra* at 363. There is nothing in *Posner* v. *Rosenbaum*, 240 A.D. 543 (N.Y. 1934), upon which Marilyn relies, which persuades us to vary our conclusions.

[8] At the start of the trial, the judge, with counsels' agreement, set out ground rules for the trial. One ground rule was that all objections to any of the bank's evidence would be preserved until the end of the trial when the objections could be argued in connection with a motion to strike. The hearsay objection to the checklist was not renewed at the conclusion of the trial and no motion was made to strike the exhibit.

the judge described the checklist as a "fragment" of the total evidence and stated that his conclusion that the Mar-Rich guaranty existed was not "solely dependent" on the checklist, but was "warranted . . . by . . . other evidence, testimonial and documentary." This evidence included Mr. Kushner's testimony that he had seen the executed guaranty, the unexecuted copy of an identical guaranty prepared for the April 1st closing, the records of the bank calling for the guaranty's execution, and the numerous debt and security instruments required of, and signed by, Marilyn. In the circumstances, any possible error in the admission of the checklist provides no basis for a new trial.

The posttrial motion for examination of the checklist was properly denied as a matter of discretion. As the judge noted, such a request should have been made during the course of pretrial discovery, not after the trial. The fact that Marilyn learned of the checklist's existence for the first time at the trial did not mandate allowance of the motion. She had ample opportunity for pretrial discovery of Mr. Kushner, but pursued no such discovery. Moreover, at no point during the trial did she state a formal and precise objection to the checklist, see note 8, *supra*, on the ground of authenticity. We see no basis to grant relief from the judge's ruling.

3. *Alleged violation of the banking laws.* Marilyn urges us to declare the April 1, 1976, refinancing of Marjack's $50,000 loan void because, in her view, the loan violated the provisions of G. L. c. 172, § 48(A)(*b*).[9] Marilyn argues that the bank's second mortage on her home in Milton constituted the "primary security" for the loan — a practice prohibited by the statute. Neither party disputes that the term "primary security," means the principal or most important security backing the loan. The

[9] General Laws, c. 172, § 48 (b), as appearing in St. 1975, c. 657, § 1, was apparently superseded in 1982 by G. L. c. 167E, § 11(*b*), inserted by St. 1982, c. 155, § 9, which makes its provisions applicable to all banks, rather than just trust companies. The pertinent section of G. L. c. 172, § 48(*b*) reads as follows: "A trust company may take a second mortgage on: . . . (b) any real estate as collateral security for a commercial or business loan; provided, however, that said second mortgage shall not be taken as the primary security for such a loan."

question, therefore, again resolves itself to one of fact, to be reviewed under the "clearly erroneous" test.[10]

We are satisfied that the record supports the judge's finding that the second mortgage was not the primary security for the Marjack refinancing. When the bank lent the first $50,000 to Marjack in February, 1976, it took as collateral pledge and security agreements by Sandy, hypothecating all of Sandy's assets, inventory, and receivables, and the written guaranties of Marilyn, Harold, Sandy, and the two trusts. These assets then constituted the loan's primary security. When the bank refinanced the $50,000 loan on April 1st, the security remained essentially the same, except for the addition of the second mortgage. Admittedly, the mortgage constituted some further back-up for the principal security carried over from February. We think it strains credulity, however, to suggest, as Marilyn does, that the extensive security taken in February no longer retained its value in April and, as a result, that the second mortgage became the bank's principal security. While the primary security for the February 19th loan may have declined in value, there was no evidence to indicate that the security had suffered a serious decline in value. Indeed, the bank's willingness to loan yet another $75,000 to Richman-controlled enterprises at the same time that it refinanced the $50,000 Marjack loan belies such a conclusion. Moreover, witnesses with expertise in the lending field gave opinions that the second mortgage constituted secondary rather than primary security. The judge had the right to rely on the opinion testimony as a supplement to the fiscal facts. On the facts found by the judge, which are supported by the evidence, the banking laws have not been violated.

*Judgment affirmed.*

---

[10] We assume, without deciding, that a violation of the statutory provision referred to in n.9 would constitute a defense to an action to collect on the debt as opposed to affording a basis for action by the banking commissioner or other regulatory authority. The case was tried on the assumption that a violation would provide such a defense. Accordingly, we accept the assumption for purposes of resolving the appeal.