Employers' Liability Assurance Corporation, Ltd., & others[1] *vs.* Hoechst Celanese Corporation.

No. 96-P-184.

Suffolk. February 4, 1997. - September 4, 1997.

Present: Perretta, Kaplan, & Dreben, JJ.

*Insurance,* General liability insurance, Notice, Construction of policy. *Hazardous Waste. Notice,* Insurance claim. *Contract,* Insurance, Indemnity. *Indemnity. Evidence,* Existence of document, Best and secondary.

Plaintiff insurers, in an action seeking a declaration of their nonliability under policies of excess insurance covering environmental damage, did not demonstrate that, under the terms of the policies, the defendant insured had not provided timely notice of its claims [472-475], and in the one instance of untimely notice, the insurers did not demonstrate that they suffered "actual prejudice" as would warrant a grant of summary judgment in favor of the plaintiffs [475-479].

Where policies of excess insurance omitted any statement about voluntary payments by the insured in the assistance and cooperation clause, there was no merit to the insurers' claims that the insured breached those clauses by making such voluntary payments. [479-481]

Plaintiff insurers seeking a declaration of their nonliability under policies of excess insurance were not entitled to summary judgment on their claim that they were not required to indemnify their insured for "liability . . . imposed on the Insured by law" in the absence of formal litigation, in circumstances in which the insured was subject to demands by the Louisiana Department of Environmental Quality with respect to the environmental cleanup of their property in Louisiana. [482-483]

An insured produced sufficient evidence of the existence of two lost insurance

---

[1]Lexington Insurance Company (Lexington), Employers' Commercial Union Insurance Company, Employers' Surplus Lines Insurance Company, Home Insurance Company, American Home Assurance Company (American Home), National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), Continental Casualty Company (Continental), and Harbor Insurance Company (Harbor).

Two other plaintiffs, Appalachian Insurance Company (Appalachian) and Affiliated FM Insurance Company (Affiliated FM) settled with the defendant pending this appeal.

Another plaintiff, Liberty Mutual Insurance Company, settled with the defendant before this appeal.

policies to warrant denial of the insurers' motion for summary judgment on the insured's claims for benefits thereunder. [483-485]

CIVIL ACTION commenced in the Superior Court Department on July 26, 1990.

Motions for summary judgment were heard by *Charles T. Spurlock, J.*

Leave to prosecute an interlocutory appeal was allowed in the Appeals Court by *Smith, J.*

*Sheldon Karasik,* of New York, for American Home Assurance Company & others.

*John T. Harding, Jr.,* for Continental Casualty Company & another.

*Richard Feldman* for Employers' Liability Assurance Corporation, Ltd., & others.

*William J. Cheeseman* for the defendant.

*R. Paul Roecker,* for The Home Insurance Company, was present but did not argue.

KAPLAN, J. This is an interlocutory appeal by eleven insurance companies, plaintiffs (now reduced to nine plaintiffs because of settlements pending appeal), from an order of the Superior Court so far as it denied their motions for summary judgment in the declaratory action they have maintained against their insured, Hoechst Celanese Corporation (HCC), defendant.

The plaintiffs issued policies affording various layers of "excess" insurance in favor of HCC over and above the "primary" policies provided to HCC by Liberty Mutual Insurance Company (Liberty Mutual) — the latter being comprehensive general liability policies (CGL) with limits of $1 million per "occurrence," as defined. The Liberty Mutual policies covered (among other things) environmental contamination through pollutants chargeable to HCC. Such damage could be found at sites around the country to which the insured's operations extended, directly or indirectly.

The plaintiffs have sought a declaration that they are free of liability toward HCC as matter of law. On this appeal, they rely on the claim that HCC was in breach of the "notice" or "assistance and cooperation" provisions of the excess policies. The plaintiffs also contend they are relieved of indemnifying HCC for various expenditures because HCC made them without ad-

versarial claims against it. Certain plaintiffs claim entitlement to judgment on particular policies attributed to them because, as they say, the policies are "lost," their existence not confirmed. The Superior Court judge concluded that summary judgment was precluded in large part because the record assembled for and against the motions left unresolved genuine issues of material fact. We agree that a case has not been made for summary judgment. In the present opinion we enlarge on certain points considered in the judge's memorandum of decision.

I. *Procedural sequence.* Liberty Mutual was originally the sole plaintiff in the case. On July 26, 1990, it filed a complaint for a declaration of nonliability naming HCC and the excess insurers as defendants. On August 29, 1990, it moved to stay the action pending the outcome of an action by HCC filed earlier, on February 16, 1989, in the New Jersey Superior Court involving the same parties. That action was dismissed on grounds of forum non conveniens.[2] The parties in the present action then moved to vacate the stay; this was allowed on October 30, 1991. HCC answered and counterclaimed and cross-claimed on December 20, 1991. Responsive pleadings were filed. On January 31, 1992, the parties filed a joint motion for realignment and the excess insurers joined Liberty Mutual as plaintiffs, leaving HCC as sole defendant. The plaintiffs entered a "first amended" complaint but it was agreed this would not require a further round of pleadings.

Liberty Mutual moved for summary judgment on November 4, 1994, as did the other plaintiffs, some of the latter filing individually, some joining the motions of others. After a record was made on both sides, the parties, at the judge's request, prepared a joint statement of the facts on which they could agree (which two plaintiffs, however, declined to join in certain respects). HCC filed a statement of what it considered to be disputed facts.

The judge ruled on the motions on September 19, 1995. Liberty Mutual was granted summary judgment of nonliability as to environmental damage at three sites (Baton Rouge, Louisiana; Leominster, Massachusetts; and Bayou Sorrell, Louisiana) where HCC had entered into settlement arrangements with outsiders without the company's consent: HCC was found in breach of the clause of the Liberty Mutual policies

[2]Hoechst Celanese Corp. vs. Liberty Mut. Ins. Co., Superior Ct. No. W-4853-89, aff'd, Superior Ct. Appellate Div. (N.J. April 30, 1991).

prohibiting "voluntary payments" by the insured.[3] Summary judgment entered for Liberty Mutual and several plaintiffs (American Home, National Union, Lexington, Appalachian, Affiliated FM, Harbor, and Continental) as excess insurers in respect to the so-called Brewer-Averette (Louisiana) site, where HCC had not shown that the contamination was "sudden and accidental" and thus excepted from the familiar "pollution exclusion" clause appearing in those excess policies and in the Liberty Mutual policies. As to the remaining sites, the judge found disputes on this "sudden and accidental" question not amenable to summary judgment. Regarding one site (Huntsman), the judge found Liberty Mutual and three excess insurers (American Home, National Union, and Lexington) entitled to qualified summary judgment leaving them still open to liability for failure to indemnify under their policies.

Liberty Mutual settled with HCC and is out of the case, leaving only the excess insurers as plaintiffs. These plaintiffs applied to a single justice of this court for leave to appeal from so much of the judge's order as denied them summary judgment; leave was granted on January 12, 1996. Pending the appeal, two plaintiffs (Appalachian and Affiliated FM) settled with HCC and departed the litigation.

II. *Sketch of the situations at four sites.* The summary judgment proceedings, involving Liberty Mutual as well as eleven excess insurers, generated an extensive record with materials pertaining to eleven sites where contamination ultimately chargeable to HCC had been discovered. As noted, Liberty Mutual and two excess insurers settled with HCC. The plaintiffs who remain are all excess insurers with policies that provide coverage at various points above $1 million.[4] There is no question here as to seven of the sites.[5] So, too, the appeal presents a

---

[3]We have no occasion on this appeal to consider whether this decision was correct. A voluntary payments question arising in connection with excess policies is dealt with below.

[4]In their briefs the parties have provided us with much information and several charts identifying which excess carriers issued policies for various layers of excess coverage during particular time periods. We do not reproduce the information here; the appeal can be understood without such detail.

[5]As noted above, the excess insurers were held free of liability regarding the Brewer-Averette site. At this stage of appeal, we can say these insurers make no claim of any disqualifying breaches by HCC in respect to the sites Combustion, Cleve Reber, Bayou Sorrell, Huntsman, Solvent, and Silresim.

narrower range of issues than was put to the judge below.[6]

Known popularly as a maker of sunglasses, Foster Grant Company, Inc. (Foster Grant), was engaged from 1953 to 1978 in the manufacture of petrochemicals and plastics at several places in this country and abroad. HCC as corporate successor of Foster Grant assumed its relevant liabilities.[7] Foster Grant's operations yielded an assortment of by-products and wastes which it disposed of in some ways offensive to current standards of environmental protection. Eventually contamination was discovered at sites where the company carried on its work or where its by-products or wastes were deposited. We are interested in the sites Baton Rouge Works, Petro-Processors, Brio, and Leominster.

*Baton Rouge Works.* For many years Foster Grant maintained a plant at Baton Rouge, Louisiana, to produce styrene monomer for the manufacture of polystyrene. There are valuable by-products of the production of styrene monomer, including toluene and styrene tar, which Foster Grant sold to others. Amounts of excess styrene tar accumulating from time to time before disposal were stored in five clay-bottomed "tar ponds" at the site and also at various off-site locations.

One such location was the Brewer-Averette site, with two tar ponds. In September, 1984, the Louisiana Department of Environmental Quality (LDEQ), the agency charged with enforcing the State environmental statute (La. Rev. Stat. Ann. §§ 30.2001 et seq.[West 1989]), issued a letter notifying HCC that styrene tar was classified as a hazardous material and that remedial action was required at Brewer-Averette. LDEQ and HCC conferred extensively. HCC was told that the five on-site tar ponds at the Baton Rouge Works also required remediation. In July, 1985, LDEQ and HCC entered into a written coopera-tive settlement agreement regarding Brewer-Averette, and HCC engaged GDC Engineering, Inc., to undertake the cleanup work there. Without a separate writing LDEQ agreed, if the Brewer-Averette cleanup proceeded satisfactorily, to permit HCC to

---

[6]The judge below rejected a number of grounds urged by the insurers for summary judgment which they do not press on this appeal.

[7]In 1975, American Hoechst Corporation (American Hoechst) purchased Foster Grant stock. Foster Grant merged into American Hoechst in 1977. American Hoechst merged with Celanese Corporation to form HCC in 1987.

In the present opinion it is often convenient to refer interchangeably to the three companies.

continue with the remediation of the five tar ponds at Baton Rouge under the same standards and methodology and with the same reporting requirements and LDEQ oversight procedures that obtained at Brewer-Averette. LDEQ wanted rapid, efficient cleanup of all tar ponds because of the threat of expanding contamination in the soil and groundwater.

Cleanup of the tar ponds at Baton Rouge ran from 1986 to 1990. During 1988-1989 contamination was found in other places at Baton Rouge, including the Badger Unit in the processing area itself; remediation efforts began in 1989 and continued.

In January, 1989, HCC sold the Baton Rouge plant to Deltech Corporation for $14.25 million, HCC continuing to be liable for pre-sale contamination and agreeing to complete the ongoing remediation.

Notice under the insurance policies regarding contamination at Baton Rouge is taken to have been given to the excess insurers in April, 1989 (shortly after the commencement of the New Jersey action). At that time work on two of the tar ponds had been completed (1987, 1988); work on the other three was in progress (completed in 1990).

For purposes of this appeal, HCC's remediation expenses through April, 1989, for Baton Rouge are taken as $17 million, in large part incurred in the cleanup of the two tar ponds. From 1989 to the present HCC has spent an additional $30 million for cleanup of the remaining three tar ponds and various other contaminated areas at the site.

*Petro-Processors.* From 1968-1971 Petro-Processors of Louisiana, Inc., removed Foster Grant's styrene tars from Baton Rouge Works to Petro-Processors' waste-handling facility at Scotlandville, Louisiana. In 1970, one Ewell, owning land abutting the Scotlandville facility, sued Petro-Processors and its customers, including Foster Grant, claiming liquid waste had escaped onto his property. Liberty Mutual defended the action (excess insurers were notified), and Foster Grant was found not liable, evidently because it had no knowledge of pollution at that site. In 1976, Ewell brought suit for alleged later damage, which is still pending (Liberty Mutual now denying coverage).

In 1980, the United States, basing itself on the charges in the Ewell actions, sued the same defendants under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq. (1994), demanding remediation of the site. A consent decree was reached in Febru-

ary, 1984, by which the defendants undertook cleanup. By agreement with the other defendants, HCC was to cover up to 4.35% of the costs. Remedial work started after June, 1987, but largely had to be abandoned; a second plan adopted in August, 1989, has been followed but has greatly enhanced the estimated costs.

The excess insurers had notice of the action by the United States as of September, 1988. For purposes of this appeal, it is agreed that HCC had expended $1.8 million through that date. The main items paid for are listed by HCC as defense costs in the second Ewell suit and the United States action; investigation and remedial design costs for 1984-1987; and remedial construction costs for 1987. HCC estimates that its total exposure may reach $10 million.

*Brio.* Foster Grant sold styrene tars to buyers who processed the material at the Brio site in Friendswood, Texas, run latterly by Brio Refining Company. In October, 1984, the United States Environmental Protection Agency (EPA) named Foster Grant a potentially responsible party (PRP), one of some twenty Brio customers so named, for pollution at the site under CERCLA. In August, 1989, EPA commenced court action. There were interim consent orders in 1985, 1986, and 1989 for studies and certain remedial activities, and HCC entered into an agreement by which it would not be responsible for more than 2% of the liability for cleanup at this site. A consent decree for remediation entered in April, 1991.

HCC was one of perhaps fifty defendants in private tort actions commencing in 1985 involving the Brio site. Two of the actions were settled in January, 1987, with HCC paying $41,700 in each. In a further settlement in May, 1992, HCC paid $539,000.

Four of the excess insurers were put on notice as early as 1985, and the other excess carriers for purposes of the appeal concede notice in March, 1987. For appeal purposes it is agreed HCC spent $164,000 in miscellaneous expenditures before that date. It appears there was no cleanup at the site before that date. Cleanup costs for the site may reach $2.5 million or more.

*Leominster.* Foster Grant long maintained its corporate headquarters at this site in Massachusetts, with manufacturing facilities there for production of polystyrene and sundry plastic goods. In April, 1986, the Massachusetts Department of Environmental Quality (DEQE) declared the company a PRP

(in effect) for contamination at the site under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G. L. c. 21E. In December, 1986, the company sold the Leominster site to North Central Technology Park Realty Trust, remaining responsible for environmental liabilities as at the time of sale. The excess insurers received notice in May, 1989. The costs incurred by HCC for cleanup activities to that date appear to be in some dispute, but at most these did not exceed $550,000. In the end it is estimated the cleanup will have cost approximately $3 million.

III. *Issues on appeal.*[8]

A. *Insurers' late notice defense.*

(1) *Time of notice.* In raising a "late notice" defense, the plaintiff insurers assumed the burdens of establishing that the defendant insured was in breach of the notice provisions of the several policies and, further, that the breach resulted in prejudice to them as insurers. See *Johnson Controls, Inc.* v. *Bowes*, 381 Mass. 278, 282 (1980). As to the requirement of demonstrated prejudice, see also G. L. c. 175, § 112, which (as appearing in St. 1977, c. 437) states:

> "An insurance company shall not deny insurance coverage [under a designated liability insurance policy] to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, claim or of a suit founded upon an occurrence, incident or claim, which may give rise to liability insured against unless the insurance company has been prejudiced thereby."

On the present record, we begin with difficulties and disputes as to when notice was provided to the insurers. With multiple sites, multiple insurers, and multiple policies providing various layers of excess insurance for varying periods of time, one could well expect differences in figuring when notices applicable to given policies were in fact received; and the trial judge lamented that "[t]he record before the court is replete with disputed facts regarding the dates on which plaintiffs were notified of claims involving their policies."

But if it was established in a given case that a notice was

---

[8]The parties agreed for purposes of summary judgment that Massachusetts law applied to the policies.

provided on a specified date, the next task for the insurers was to prove that the notice was untimely. Here the terms of the notice clauses of the excess policies need to be sharply distinguished from the notice provisions of primary policies — take a CGL policy as an example. Under such primary policies the insured is typically instructed to give notice to the carrier "promptly," "immediately," "as soon as practicable" (or the like) after the happening of an occurrence. In contrast, a typical notice provision in an excess policy (appearing in some of the policies at bar) states:

> "Whenever the insured has information from which the insured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event the insured should be held liable, is likely to involve this policy, notice shall be sent to the Company as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim."

Another typical notice provision (appearing in other policies at bar) commences thus:

> "When an occurrence takes place which, in the opinion of the insured, involves or may involve liability on the part of the company, notice shall be given by or on behalf of the insured to the company. [The clause ends with the substance of the proviso in the clause set out above.]"

Notice under these clauses is tied, not to occurrence, but to "information" or "opinion" held by the insured. The effect is that, to establish untimeliness, it would have to be shown that HCC had information or had formed an opinion at a particular time that a claim would implicate the applicable excess policy layer —i.e., that a claim would exhaust the primary coverage and reach the excess layer — and then failed to notify the insurer for an unreasonable period thereafter.

The insurers' task is complicated by a number of factors. Where the clauses speak of "information" leading the insured to "reasonably conclude," or of the insured's "opinion," is the reference to the knowledge or opinion actually entertained by the insured (a subjective measure) or the knowledge or opinion

the insured should have had or entertained in all the circumstances (objective measure)?[9]

However, the subjectivity-objectivity point is not crucial, for, in a larger sense, the rubbery language used throughout the notice clauses results in giving the insured some leeway or discretion in forming a judgment about when excess protection is implicated. The saving proviso in both clauses is symptomatic.

We add that this looseness responds to the realities of the situations that must often confront the policyholders in these environmental cases. Take remediation. The nature and causes of environmental threats may not be instantly apparent. The contemplated costs of cleanup may vary as findings are progressively made and technical analysis proceeds. The unexpected regularly obtrudes. The attitudes and requirements of regulatory agencies are not constant and the changes and variations must affect the estimates.

Turning to the four sites at issue, we think, first, the insurers failed to establish that the notice provided to them about the Brio site was untimely. All insurers concede that notice was given by March, 1987. By that date HCC had expended but $164,000 in relevant costs, well below the $1 million incept of excess coverage. HCC had no basis then for a claim against any excess insurer, but the notice gave warning that the excess coverage of the policies might later be attained and the insurers

---

[9]There is no Massachusetts authority interpreting the quoted language. Decisions elsewhere interpreting the language first quoted in our text are rather equivocal, seeming to lean in opposite directions. Compare *Trustees of Univ. of Pa.* v. *Lexington Ins. Co.*, 815 F.2d 890, 896 (3d Cir. 1987); *Olin Corp.* v. *Insurance Co. of N. Am.*, 743 F. Supp. 1044, 1054-1055 (S.D. N.Y. 1990), aff'd, 929 F.2d 62 (2d Cir. 1991); *Atlanta Intl. Ins. Co.* v. *Checker Taxi Co.*, 214 Ill. App. 3d 440, 445-446 (1991); *Hartford Acc. & Indem. Co.* v. *Rush-Presbyterian-St. Luke's Med. Ctr.*, 231 Ill. App. 3d 143, 147-153 (1992). It may be possible to reconcile the cases on the footing that an insurer, to establish untimeliness of notice, must prove that at a certain time the insured had and was conscious of information (subjective) from which it should reasonably have concluded (objective) that excess insurance would likely be implicated, and then delayed for an unreasonable time in giving notice. Maybe a like reading could be given to the "opinion" wording. To the extent that the provisions are unclear, they of course should be read in a light favorable to the insured.

The recent trend in the writing of notice provisions in excess policies is to cut down on the notable discretion allowed to the insured in older policies such as those in litigation here. See, e.g., *Fireman's Fund Ins. Co.* v. *ACC Chemical Co.*, 538 N.W.2d 259, 263 (Iowa 1995).

should attend to their interests. The insurers, carrying a burden of proof, offer no substantial basis for a contention — and surely do not demonstrate as matter of law — that at some point antedating the notice that was given, HCC had information or entertained an opinion, within the meaning of the policy provisions, that excess coverage would be reached, and then delayed unduly in providing notice.

The pattern was much the same at the Leominster site, where at the time of notice, May, 1989, HCC had expended only $64,000 (the insurers propose $500,000 or thereabouts). So again the insurers fail to show that the notice they received was untimely, let alone untimely as matter of law.

The insurers have a stronger case that HCC gave untimely notice in respect to the Petro-Processors site, where at the time notice was provided, say September, 1988, HCC had already paid out $1.8 million, entering upon a first layer of excess coverage. This looks like a breach to that extent of the notice clause, rubbery as that may be. However, HCC points out that remedial work did not in fact begin until 1987, and that work was suspended from January, 1988, to 1989, in order to find an improved treatment method. This may suggest that HCC's expenditures or some of them were incurred not long before notice was provided, which in turn would suggest that notice was not untimely or not seriously so. On the whole, despite doubt, we conclude that summary judgment was rightly denied.

The insurers make a persuasive case that notice after a $17 million expenditure at the Baton Rouge site was untimely.

(2) *Question of prejudice.*[10] The Supreme Judicial Court in *Johnson Controls, Inc.* v. *Bowes*, 381 Mass. at 280, turned away from a "strict contractual interpretation of notice provisions as a condition precedent to an insurer's liability." Noting that an

---

[10]The question of prejudice is not reached as to Petro-Processors, Brio, or Leominster if, as indicated above, notice was not shown to be untimely in respect to those sites. If the question should be reached, it would be answered in each case on the lines of our remarks, mainly about Baton Rouge, in this Part IIIA(2).

In particular, as to Petro-Processors and Brio, we add that HCC has contended that information about the situation at those sites may have come to the excess insurers from insureds, other than HCC, at times before HCC gave notice. This would not count as earlier notice on HCC's behalf, but could bear on any claims of prejudice by the insurers. The plaintiffs did not give discovery on this subject; the judge below allowed HCC's motion to compel discovery, but the order was stayed by the single justice pending the instant appeal.

insured rarely can bargain over an aspect of a policy such as notice, and concerned that a "classic contractual approach involves a forfeiture," *id.* at 281, the court held that an insurer asserting a late notice defense (there under a policy not covered by G. L. c. 175, § 112) must demonstrate that it has been prejudiced. *Id.* at 282. It said, "In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation." *Id.* at 282, quoting from *Brakeman* v. *Potomac Ins. Co.,* 472 Pa. 66, 74-75 (1977).

Attention is now to be directed, not to the nature of the insured's dereliction in providing late notice, but rather to what prejudice the insurer has incurred, and could not by its own actions reasonably avoid, in consequence of the late notice — any such prejudice having to relate to the insurer's general object of defeating fraudulent, invalid, or exaggerated claims. And the prejudice shown, to relieve the insurer, must have been material and specific. The insurer is challenged to show that it suffered "actual prejudice," not just a "possibility" of it; that there has been "actual harm" to its interests; that it has been relegated to a "substantially less favorable position than it would have been in had timely notice been provided." Further, the insurer has "the burden of identifying the precise manner in which its interests have suffered." *Darcy* v. *Hartford Ins. Co,* 407 Mass. 481, 486-487 (1990).

In the proceedings below, the insurers were lacking the specific proofs required. Having scanted below in presenting the basic grass roots evidence of the effects upon them of delayed notice, they attempt on the present appeal to postulate general propositions or presumptions in their own favor.

They ask us to assume prejudice because of the alteration of conditions at sites prior to notice. Consider Baton Rouge, the most promising situation for the insurers. The alteration consisted notably of the closing of two tar ponds. It is true that irreversible physical changes before notice, closing off sources

of evidence, may well bear on the prejudice issue.[11] But the insurers do not explain why at Baton Rouge they could not have found the technical and other evidence needed to evaluate the adopted methods of cleanup, or to answer other relevant inquiries, at the three tar ponds that remained open at the time of notice and evidently were under treatment then and later. So also the insurers underplay the potential use of the extensive records of the remediation of the entire site from the beginning, including reports rendered to LDEQ from time to time, to all of which they had access. As it could be found that recreation of what occurred at the site was reasonably feasible,[12] the insurers are far from demonstrating material prejudice as matter of law arising from lost evidence.[13]

Next, the plaintiffs contend that they were prejudiced by HCC's assumption of liabilities: had they been properly notified, it is suggested, they might have come in (presumably through the "assistance and cooperation" clauses of the policies, see Part IIIB below) to influence the arrangements in some salutary ways, e.g., by securing less costly terms, and of this chance they have been deprived. We do not accept as a generalization that an insured's assumption of liabilities before (delayed) notice is in itself conclusive that the insurer has suffered prejudice.[14] At Baton Rouge HCC's assumption of liabilities to remediate the site consisted specifically of its arrangements with LDEQ and the indemnity agreement with the

---

[11]For cases where insurers have demonstrated that the loss of evidence was crucially hurtful, see *West Bay Exploration Co.* v. *AIG Specialty Agencies of Tex., Inc.*, 915 F.2d 1030, 1037 (6th Cir. 1990); *Fireman's Fund Ins. Co.* v. *Valley Manufactured Prod. Co.*, 765 F. Supp. 1121, 1128-1129 (D. Mass. 1991); *Hoppy's Oil Serv., Inc.* v. *Insurance Co. of N. Am.*, 783 F. Supp. 1505, 1510-1511 (D. Mass. 1992).

[12]There is some intimation that where much has happened at the insured's initiative before the insurer is put on notice, it is unfair to require the insurer to run the course again to prove prejudice. There may be cases where the task is very onerous and should not be cast on the insurer. The plaintiffs have not made out such a case as yet in respect to Baton Rouge.

[13]For evaluations of what was in fact lost by lost evidence, see, e.g., *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 760-762 (1993); *Pittston Co.* v. *Allianz Ins. Co.*, 905 F. Supp. 1279, 1312 (D.N.J. 1995). Cf. *Darcy* v. *Hartford Ins. Co.*, 407 Mass. at 487 (declining to disturb finding of no prejudice where insurance company failed to conduct investigation after receiving admittedly untimely notice).

[14]Cases intimating such a proposition are contrary to Massachusetts law and policy. See *In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litigation*, 15 F.3d 1249, 1254-1256 (3d Cir.), cert. denied, 513 U.S. 915

purchaser. The issue of prejudice by reason of these agreements is one of fact (like the issue of notice), and the insurers, having chosen not to investigate even after notice, have not come near any demonstration that the agreements were other than sound in a business sense.[15]

To sum up, what emerges from the record and argument is that the insurers want prejudice to be presumed (the need for specific proof being dispensed with) when the insured before notice has altered conditions, assumed liabilities, etc. Such an approach to the question of prejudice has been pointedly rejected. In *Darcy* v. *Hartford Ins. Co.*, 407 Mass. at 485, the insurer similarly proposed the adoption of a (rebuttable) presumption of prejudice in a case of delay of more than five years in providing notice. The court said (407 Mass. at 486):

> "Adopting the presumption [the insurer] seeks would, in effect, constitute a retreat to a mode of interpretation of insurance policies which invites technical forfeitures, and would conflict sharply with the view, previously expressed by both the Legislature and this court, that forfeitures should only occur upon a showing of actual prejudice to an insurer's interests. See G. L. c. 175, § 112 (1988 ed.); *Johnson Controls, Inc.* v. *Bowes, supra.* By its very nature, a presumption, in cases in which it is applied, would tend to relieve an insurer of its burden to demonstrate actual harm to its interests. Such a rule could permit an insurer to avoid liability on the basis of the possibility, rather than on proof of actual prejudice."

In *Darcy* the court was dealing with the issue of prejudice resulting from late notification in the case of a primary insurer. To create a presumption of prejudice in favor of excess insurers would be quite anomalous. Excess carriers are not as likely as primary carriers to suffer harm from late notice because they are at a remove from the investigation and handling of claims: ordinarily they are not bound to do this work and they have no

---

(1994); *Twin City Fire Ins. Co.* v. *King County,* 749 F. Supp. 230, 234 (D. Wash. 1990). Compare IIIB below.

[15]For cases assessing whether the insurer would have done better than the insured had it received timely notice, see *Triangle Publications, Inc* v. *Liberty Mut. Ins. Co.*, 703 F. Supp. 367, 372 (E.D. Pa. 1989); *Cessna Aircraft Co.* v. *Hartford Acc. & Indem. Co.*, 900 F. Supp. 1489, 1516-1518 (D. Kan. 1995); *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th at 761-763.

duty to defend the insured. Mostly they rely on the primary insurer in the first instance to do the job. Just here the facts may be helpful to the insurers in this case: if HCC failed to provide the prompt notice of occurrence to Liberty Mutual required by the CGL policy, this may have reduced Liberty Mutual's effectiveness in its role as initial investigator for the excess insurers. But this is a possibility in a mix of factors bearing on a defense of prejudice.

The plaintiff insurers have not established prejudice as matter of law. This of course does not preclude their achieving a more congenial result after ventilation of all the facts at trial.

B. *Claimed breach of assistance and cooperation clause.* Liberty Mutual's primary comprehensive general liability policy (for 1978) provides as a "condition":

> "The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.*" (Emphasis supplied).

In *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117 (1991), the court, interpreting and applying the italicized language,[16] held for the primary insurer where the insured, without the knowledge or permission of the insurer, had "agreed to a settlement [of an environmental claim], entered into a consent judgment, assumed the obligation to pay the entire cost of the cleanup, and in fact paid a portion of that cost." *Id.* at 123. In those circumstances, the court did not require of the insurer that it make a separate demonstration that it had been prejudiced.

The excess insurers would like somehow to apply *Augat* to the assistance and cooperation provision of their policies. They argue that this provision is the "functional equivalent" of a

---

[16]Payment under some official compulsion was considered still a payment "of choice" and "voluntary" within this policy language. *Id.* at 121-122.

voluntary payment clause — that (in a transcendental sense) it contains or embodies such a clause[17] ; and, further, that if an insured makes a voluntary payment (e.g., an acknowledgment of liability) contrary to the supposedly included prohibition, the insurer is free of liability under the policy without having to show prejudice. The argument is fallacious.

The assistance and cooperation clause in the excess policies is as follows:

> "The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but the Company shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding."

It will be noted that this clause corresponds in purpose to the first sentence of the Liberty Mutual provision: the subject is cooperation between the parties in dealing with claims. (In detail, however, the provisions differ markedly, as befits the difference in the tactical positions of primary and excess insurers.) But the critical fact is that the excess policies' assistance and cooperation clause omits any statement about voluntary payments by the insured.

We think the judge below was right to say bluntly, "The clause [in the excess policies] does not even vaguely refer to voluntary payments. If the insurers meant to exclude coverage for voluntary payments they should have done so explicitly. See *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993)." There is no apparent ambiguity here; if any can be discerned, it is not resolved in the insurers' favor in any part of this record on summary judgment.

The assistance and cooperation clause in the excess policies exempts the insurer from assuming charge of the defense and settlement of claims. It gives the insurer a right to associate

---

[17]The insurers refer on this point to *Ralston Purina Co.* v. *Home Ins. Co.*, 760 F.2d 897, 897-900 (8th Cir. 1985), but the suggestion is farfetched.

itself with the insured and the primary insurer in the defense and control of a claim which is at the excess policy level, and the parties are then to cooperate in the defense. The statute, G. L. c. 175, § 112, does not by its terms apply to an asserted breach of an assistance and cooperation clause, but the common law comes in to cast the burden of demonstrating prejudice on the insurer. See *Darcy* v. *Hartford Ins. Co.*, 407 Mass. at 490. The excess insurers have not shown any inclination to associate themselves in the defense of claims and so are in an awkward position to invoke the clause or assert its breach. If voluntary payments by an insured are tendered as evidence of a breach of the assistance and cooperation clause, the matter has to be analyzed on its merits without reference to any per se prohibitory rule, and the issue of prejudice remains.

Incidentally, the excess insurers appear from the start to be misreading *Augat* itself when they suggest that, in the face of a violation by an insured of the express prohibition of voluntary payments in a primary policy, the insurer is forthwith discharged of responsibility without having to demonstrate prejudice. In *Augat* the particular facts established prejudice without more. Thus the court said, "We conclude that no showing of prejudice is required *in this case*" (emphasis supplied). The later case of *Sarnafil, Inc.* v. *Peerless Ins. Co.*, 418 Mass. 295 (1994), involved a claimed breach of a voluntary payment provision, as well as a notice provision, in a primary policy. The court was clear (418 Mass. at 305) that "before Peerless could be relieved of responsibility based on Sarnafil's violations of insurance provisions, Peerless would have to show that it had incurred actual prejudice. *Augat, Inc.* v. *Liberty Mut. Ins. Co*, [410 Mass.] at 122-123. *Darcy* v. *Hartford Ins. Co.*, 407 Mass. 481, 491 (1990)." And again, "It may very well be that [the insurer] will prevail at trial based on . . . a showing of prejudice . . . " but the issue could not be prejudged on summary judgment. *Sarnafil, Inc.* v. *Peerless Ins. Co.*, 418 Mass. at 306. See also *New England Extrusion, Inc.* v. *American Alliance Ins. Co.*, 874 F. Supp. 467, 471 (D. Mass. 1995). For an analytical demonstration that an insured's breach of a voluntary payment provision (like breach of a notice provision) should not avail the insurer unless the insurer sustains the burden of proving that it has been prejudiced thereby, see *Cessna Aircraft Co.* v. *Hartford Acc. & Indem. Co.*, 900 F. Supp. at 1516-1518, citing *Roberts Oil Co.* v. *Transamerica Ins. Co.*, 113 N.M. 745, 751 (1992).

C. *Duty to indemnify: question of necessity for adversarial claim.* Continental Casualty Company and Harbor Insurance Company (joined by other plaintiff insurers) make a distinct argument — that they are under no duty to indemnify HCC for its cleanup expenses at the Baton Rouge site in the absence (as they assert) of an adversarial third-party claim against HCC to compel the cleanup.

The excess policies typically provide, under the heading "Coverage":

> "The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability (a) imposed upon the Insured by law . . . for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of . . . (ii) property damage . . . caused by or arising out of each occurrence happening anywhere in the world."[18]

The insurers try to read a supposed requirement of an adversarial claim — meaning a lawsuit or a similar compulsory proceeding — into the words "liability . . . imposed upon the Insured by law." In a superficial view, this seems incorrect, for we regularly speak of the existence of legal liabilities although they have not been and are not being established by actual litigation.

But if it be assumed that the clause envisages third-party compulsion upon the insured, in this case to clean up at Baton Rouge, then HCC contends that LDEQ's intervention and demands on it for remediation amounted to compulsion, although formal steps by LDEQ under the State environmental statute were obviated when the agency was reasonably assured that HCC would be in compliance. In accepting HCC's contention, the judge below relied on *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 693-697 (1990). The question there was whether the receipt of an EPA letter by

---

[18]The definition of "ultimate net loss" does not in terms resolve the issue whether covered damages are limited to those arising out of a lawsuit or other formal proceeding but it may fairly be said that the language is compatible with the view that such adversarial claim is not required to initiate the duty to indemnify.

Hazen identifying it as a PRP and requesting that Hazen participate in remediation, was the substantial equivalent of a "suit" which under the policy inaugurated the insurer's duty to defend. The Supreme Judicial Court held that it was an equivalent. The court, recognizing the "extrajudicial" solutions (*id.* at 696) available to the EPA against supposed polluters, said: "The situation was such that the opportunity to protect Hazen's interests could well have been lost, long before any lawsuit would be brought. It would be naive to characterize the EPA letter as a request for voluntary action. Hazen had no practical choice other than to respond actively to the letter." *Id.* at 697 (footnote omittted). We think a similar understanding of practicalities and similar reasoning apply in determining the excess insurers' obligation herein to "indemnify." It is hard to see what public interest would be promoted by having an insured deliberately await, or even actively encourage, formal litigation by an environmental agency in order to make sure that the insured's right of indemnification would not be compromised.

The insurers cite *Ryan* v. *Royal Ins. Co.,* 916 F.2d 731, 735-743 (1st Cir. 1990). In that case the court was applying New York law which has taken a view contrary to *Hazen* on similar facts (whether PRP letter was suit under policy). See the reference in *Hazen Paper Co.* v. *United States Fid. & Guar. Co.,* 407 Mass. at 693, to New York law preceding and eventuating in the position taken in the *Ryan* case.

The insurers do not merit summary judgment on the adversarial claim question. They appear to suggest that even if actions by LDEQ short of formal proceedings could in some circumstance amount to compulsion, they were not so tendentious here; the insurers intimate that HCC was cleaning the site in order to facilitate the sale of the property and was not responding at all to pressure from LDEQ. At most these suggestions would pose questions of fact about the precise confrontation between HCC and LDEQ, questions inappropriate for decision on summary judgment.

D. *Lost policies.* HCC claimed below the benefits of two policies[19] allegedly issued to Foster Grant for certain time periods by, respectively, Employers' Liability Assurance Corporation, Ltd. (ELAC), and Employers' Surplus Lines Insur-

---

[19]A third policy was in question below but for purposes of the appeal its existence and terms are now accepted.

ance Company (ESLIC). However, HCC was unable to produce the physical policies; they were evidently "lost." In such circumstances, a proponent of the policies bears the burden of proving that the instruments were issued, and he must also prove their terms. See *Markline Co.* v. *Travelers Ins. Co.*, 384 Mass. 139, 140 (1981). The proof may be made by "secondary" evidence of any conventional type. See *Capitol Bank & Trust Co.* v. *Richman*, 19 Mass. App. Ct. 515, 521 (1985). HCC also notes, quoting from Liacos, Handbook of Massachusetts Evidence § 12.7.1 (6th ed. 1994), that "the questions of whether an original document ever existed or whether secondary evidence correctly reflects the content of the original are not preliminary questions of fact [for the judge] but questions for the jury."

HCC presented the affidavit of Meyer S. Gottlieb, who was the former insurance manager for American Hoescht Corporation. In 1984 Gottlieb reviewed the Foster Grant insurance files and wrote a letter to AHC's insurance broker, Johnson & Higgins, which included a chart of excess and umbrella policies.[20] The chart identified an ELAC policy, No. E-15-8091-001, for the period 1/16/64 - 1/16/65, in the amount, appearing under the heading "Limit," of $5 million in excess coverage over the $1 million primary coverage. The chart also identified an ESLIC policy, No. 5-16-00002, for the period 1/1/62 - 1/1/64,[21] but under "Limit" Gottlieb placed a question mark. The judge found that the insurers' standard policy forms and policy jackets provided the likely texts of these lost policies.

The judge concluded that HCC had made enough progress with its secondary evidence to create a genuine issue of fact as to the existence and terms of the policies. This averted summary judgment for the insurers under the rule of *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711-712 (1991), describing the conditions of the evidence that do or do not justify summary judgment against a party bearing the burden of proof. There is some trouble with the ESLIC policy because the chart does not tie down the amount of the coverage. However, it is possible to infer that the coverage, the first and only layer

[20]HCC produced the first, unsigned page of this letter dated October 25, 1984. What happened to any additional pages is unknown but Gottlieb recognized the letter as his own.

[21]A notecard produced by ESLIC in discovery shows the company assigned the policy number to Foster Grant.

of excess coverage, was $5 million as a minimum. See *Emons Indus., Inc.* v. *Liberty Mut. Fire Ins. Co.*, 545 F. Supp. 185, 189 (S.D.N.Y. 1982). With some misgivings, we think trial is called for as to the ESLIC as well as the ELAC policy.

The insurers have raised the question whether to establish a lost policy the proponent must make proof to a preponderance or to some higher level, such as "clear and convincing proof." The Supreme Judicial Court has not articulated a standard for lost policy cases, and the insurers are able to point to some authority elsewhere looking to an elevated requirement. The judge below thought the usual preponderance standard would apply in this commercial setting (unrelated to any claim of fraud, cf. Mass.R.Civ.P. 9[b], 365 Mass. 751 [1974]). Indeed, the Supreme Judicial Court has cautioned against imposing more stringent standards of proof except where the most important rights or interests of individuals are at stake. See *Medical Malpractice Joint Underwriting Assn. of Mass.* v. *Commissioner of Ins.*, 395 Mass. 43, 46-47 (1985). We have to mention also that a careful and thoughtful argument for preserving the preponderance rule in lost policy matters has appeared recently in *Remington Arms Co.* v. *Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1423-1426 (D. Del. 1992). We venture to suggest that on the present record there is a question of fact regarding the ELAC policy even if the insured is bound in the end to present more than a preponderance of the evidence; somewhat less surely so, in the case of the ESLIC policy.

The order denying the motions for summary judgment is affirmed, and the case is remanded for trial.

*So ordered.*