[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Northeast Utilities, The Connecticut Light Power Company ("CLP"), Western Massachusetts Electric Company and Public Service Company of New Hampshire ("PSNH") (collectively "NU") seek to compel Century Indemnity and Pacific Employers Insurance Company (collectively, "CIGNA") to arbitrate ten CIGNA policies. NU is also seeking to stay litigation in the above-captioned case of Century Indemnity Company, et al v. Northeast Utilities, etal.
Statement of Facts
Between 1936 and 1986, CIGNA sold to NU policies of general liability insurance. Under the terms of those policies, CIGNA agreed to indemnify NU for losses arising out of NU's ownership, operation or other involvement at industrial facilities and sites located primarily in Connecticut, Massachusetts and New Hampshire. NU notified CIGNA of several claims that have been asserted or threatened against NU which allege environmental pollution at sites owned or operated by NU, or where NU was the generator of wastes disposed at the site. NU demanded that CIGNA, pursuant to the policies issued to NU, pay the past and future costs and liabilities incurred at these sites consistent with the terms and limits of liability of the CIGNA policies. In response, CIGNA reserved its rights. Thereafter, on December 1, 1998 CIGNA filed the second above captioned action against NU and more than thirty other insurers of NU.
By Memorandum of Decision dated May 24, 1999 this court granted NU' s Motion to dismiss Count II of the declaratory judgment action which sought a determination of the coverage CT Page 8020 responsibilities of the other insurers who issued various insurance policies to NU.
NU is seeking to compel arbitration of the following policies:
Insurer Policy Number Dates of Coverage Insured
IINA MP 10856 7/1/36-7/1/39 CLPIINA Unknown 7/1/39-7/1/42 CLPAetna MCL 21162 7/1/56-7/1/59 CLPAetna MCL 468557 7/1/59-7/1/62 CLP
Aetna MCL 610108 7/1/62-7/1/65 CLP Aetna EX000101 7/1/65-7/1/68 CLP Aetna EX000111 6/30/66-1/1/68 NU Aetna EX000101 1/1/68-7/1/68 NU Aetna EX000104 7/1/68-7/1/71 NU Aetna EX000115 7/1/71-11/1/72 NU
CIGNA has consented to the referral of seven of the above-referenced policies to arbitration and to the stay of all litigation with respect to non-New Hampshire sites covered by those policies. NU claims chat the other three policies, which are set forth in bold print above, were issued to CLP by CIGNA's predecessors, Indemnity Insurance Company of North America ("IINA") and Aetna. However, neither NU nor CIGNA can locate those policies.
NU has filed an Amended Application for Order to Proceed with Arbitration in which it omitted reference to other Aetna, Standard Surety Casualty Company of New York, and Century Indemnity policies issued to CLP during the period of 1942-1956. NU has represented that it has thus, in effect, withdrawn its application to compel arbitration with respect to those policies at this time because it lacks enough evidence to prove the existence of the arbitration provisions included in those policies.
The issues presently before this court are, therefore, 1) whether to refer the three missing policies to arbitration, 2) the scope of the arbitration, and 3) whether to stay the remaining litigation which pertains to different insurance policies (PSNH policies) and different sites (New Hampshire sites).
The Missing Policies
CT Page 8021
The Law
"Arbitration agreements are contracts" subject to "accepted rules of [state] contract law." Levine v. Advest, 244 Conn. 732,745, 714 A.2d 649, 655 (1998); see also Scinto V. Sosin,51 Conn. App. 222, 233, 721 A.2d 552, 559 (1998) ("general principles of contract law" apply to arbitration agreements); Progressive Cas.Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela,991 F.2d 42, 46 (2d Cir. 1993) (under the Federal Arbitration Act (FAA), "[a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law"); Topf v. Warnaco,Inc., 942 F. Sup. 762, 766 (D. Conn. 1996) ("In determining the existence of an arbitration agreement, ordinary principles of contract law are to be used;" applying Conn. law).
It is axiomatic under Connecticut law that "[a]rbitration is a creature of contract and [that] without a contractual agreement to arbitrate there can be no arbitration." Scinto v. Sosin,51 Conn. App. 222, 227, 721 A.2d 552 (1998), quoting WesleyanUniversity v. Rissel Construction Associates, Inc.,1 Conn. App. 351, 354, 472 A.2d 23,cert. denied, 193 Conn. 802, 474 A.2d 1259
(1984). Any contractual agreement to arbitrate must also meet the requirements of the Connecticut arbitration statute, which requires, among other things, that the agreement be in writing. C.G.S. §§ 52-408 (an arbitration agreement is "[am agreement in any written contract . . . to settle by arbitration any controversy thereafter arising out of any such contract. . . ."). Therefore, without proof of a written agreement to arbitrate, an application to compel arbitration must be denied. Bennett v.Meader, 208 Conn. 352, 362-63, 545 A.2d 553, 558-59 (1988); See also C.G.S. § 52-408.
CIGNA argues, essentially, that there is no written agreement to arbitrate the three missing policies because they are missing. This argument is based on the incorrect assumption that a written document which is lost is no longer enforceable.
Connecticut law distinguishes between the substantive requirement that an agreement be in writing and the evidentiary requirements for proving the existence of the writing under the Best Evidence Rule. Even though the Statute of Frauds requires certain agreements to be in writing to be enforceable, the CT Page 8022 Connecticut Supreme Court has held that the existence and terms of a lost written agreement may be proven by secondary evidence.Connecticut Bank Trust Co. v. Wilcox, 201 Conn. 570, 574,518 A.2d 928, 931 (1986) ("the loss or destruction of a memorandum does not deprive it of effect under the Statute of Frauds," where the writing can be proven by secondary evidence) (citing Restatement (Second) of Contracts § 137). As one leading commentator has explained:
 If the requirements of the statute [of frauds] are satisfied by a signed contract or memorandum, the contract remains enforceable even though the writing is lost or destroyed. The contents of the writing can then be proven by parol testimony and the contract enforced.
4 Corbin on Contracts § 23.10 (1997 and Supp. 1999); see alsoVigano v. Wylain, Inc., 633 F.2d 522, 527 (8th Cir. 1980) ("Secondary proof of a written contract is essentially a problem coming under the Best Evidence Rule, Rule 1002 et seq. of the Federal Rules of Evidence, not the Statute of Frauds").
Under Connecticut law, NU has the initial burden of proving the existence and terms of unavailable agreements through secondary evidence by a preponderance of the evidence.Connecticut Bank Trust Co. v. Wilcox, 201 Conn. 570, 574,518 A.2d 928, 930-31 (1986) (secondary evidence of guaranty included business records and employee testimony); Remington Arms Co. v.Liberty Mut. Ins. Co., 810 F. Sup. 1420, 1423-26 (D. Del. 1992) (applying Connecticut law per stipulation of parties as set forth in 142 ERD 408; secondary evidence included insured's business records and policies from prior and subsequent years)
Missing insurance policies may be proven by secondary evidence — e.g., correspondence, memos, testimony, etc.Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F. Sup. 1420,1423-26 (D. Del. 1992); Safeco v. Great Am. Ins. Co., Civil Action No. 87-664-JU (June 20, 1990, Federal Dist. Ct. of Or.);Gold Fields Am. Corp. v. Aetna Cas. Sur. Co., 173 Misc.2d 901,661 N.Y.S.2d 948 (1997); Rubenstein v. Royal Ins. Co. ofAmerica, 694 N.E.2d 381, 384 (Mass.App. 1998); Employers' Liab.Assur. Corp. v. Hoechst Celanese Corp., 684 N.E.2d 600, 6 12-13 (Mass.App. 1997).
In Remington Arms Co. v. Liberty Mut. Ins. Co., supra, the insured brought an action against the insurer seeking coverage CT Page 8023 for environmental contamination under various primary and excess insurance policies. As in this case, the nature of the claim implicated many years and the parties were unable to locate certain insurance policies. Both parties moved for summary judgment on the issue of missing insurance policies. The court held that the plaintiff had made out a prima facie case as to the existence and content of the missing insurance policies, but that it could not grant summary judgment in the plaintiffs favor because under Federal Rule 1008 the issue of whether a writing ever existed or whether other evidence of the lost writing reflects its contents is a matter for the trier.
The court criticized the case of Boyce Thompson Inst. ForPlant Research, Inc. v. Insurance Co. of North America,751 F. Sup. 1137 (S.D.N.Y. 1990), which stated that a party must prove the terms and existence of missing insurance policies by clear and convincing evidence. The court held that the standard of proof of the existence of missing insurance policies was the preponderance of the evidence in part because "[m]issing insurance policies are in no way analogously vulnerable to fraud because the nature of the documents used to prove the existence and contents of lost or missing insurance policies are inherently more reliable than the majority of papers offered into evidence. The evidence used to establish the existence and contents of these policies is usually comprised of business records and standard forms made by and found in the possession of the party against whom they are being offered." at 1425.
In Rubenstein v. Royal Ins. Co. of America, supra, the insured sued six liability insurers whose policies had covered it during the 63 years when it owned the property on which a leaky underground oil tank was no giving rise to cleanup claims. The insured settled its disputes with all insurers except Royal. Royal's policies during period 1969-1977 were all missing. The court concluded that the plaintiff had demonstrated that Royal had issued four liability insurance policies to the plaintiff between 1969 and 1977 and that only one policy did not exclude pollution. On appeal Royal argued that there was insufficient evidence to establish the existence and terms of that policy.
The Massachusetts Appellate Court held that the insured's testimony concerning the lost policies, an insurance schedule prepared by an insurance agency which showed policy numbers and coverage dates, specimen forms of the type of policy used by Royal at the time, internal company memoranda forwarded to CT Page 8024 underwriters which referred to the pollution exclusion provision, and testimony of two employees of Royal were sufficient to permit the court to find the existence and terms of the policies in question.
NU can meet its burden of proof by introducing evidence that the unavailable policies are renewal policies because "the renewal agreement is presumed to adopt and have reference to the terms of the existing or expiring policy." Westchester Fire Ins.Co. v. Tantalo, 273 F. Sup. 7, 17 (D. Conn. 1967) (applying Conn. law). See, e.g., Elson v. State Farm Fire and Casualty Co.,295 Ill. App.3d 1, 7, 691 N.E.2d 807, 812 (1998) (renewal of insurance "unless otherwise expressed, is on the same terms and conditions as were contained in the original policy"); Wynn v. Avemco Ins.Co., 1998 OK 75, 963 P.2d 572, 574 (1998) ("it is presumed, unless a contrary intention appears, that the parties intended that the renewal policy cover the same terms, conditions, and exceptions as the original") (citations omitted); Patel v.Northfield Ins. Co., 940 F. Sup. 995, 1000 (N.D. Tex. 1996) ("In the absence of an agreement to the contrary, the presumption is that renewals are on the same terms, conditions, and amounts as provided in the original policy"); Resolution Trust Corp. v. TheAmerican Casualty Company of Reading, PA, 874 F. Sup. 961, 967
(E.D. Mo. 1995) ("a renewal is also considered a contract with the same terms and conditions as those contained in the policy which is renewed"); Countryside Oil Co. v. Travelers Ins. Co.,928 F. Sup. 474, 481 (D.N.J. 1995) (pollution case; "an insured is permitted to assume that a renewal policy affords the same coverage as the previous policy"); Lexington Ins. Co. v. AmericanHealthcare Providers, 621 N.E.2d 332, 340 (Ind. Ct;App. 1993) ("insureds can presume that the renewal of an insurance policy will be on the same terms as previously agreed unless they are specifically notified otherwise"); Schock v. Penn Township MutualFire Ins. Ass'n of Lancaster County, 148 Pa. Super. 77, 80,24 A.2d 741, 743 (1942) ("the delivery of the policy as a renewal, in the absence of notice or explanation that the terms of the policy had been altered, contemplated the same terms and conditions as the existing insurance"); L. Lewitt Co., Inc. v.Jewelers Safety Fund Soc., 249 N.Y. 217, 222, 164 N.E. 29, 31
(N.Y.Ct.App. 1928) ("An agreement to renew a policy, implies that the terms of the existing policy are to be continued . . . in the absence of evidence, that a change was intended") (citations omitted); 13A Appleman's Insurance Law Practice § 7648, p. 456 ("where a policy is renewed by agreement of the parties, it is presumed that the same terms, conditions, premiums, and CT Page 8025 subject matter obtain in the new contract as in the old").
"A rebuttable presumption is equivalent to prima facie proof of a fact and can be rebutted only by the opposing party's production of sufficient and persuasive contradictory evidence that disproves the fact that is the subject of the presumption."Schult v. Schult, 40 Conn. App. 675, 684, 672 A.2d 959, 965
(1996), affd 241 Conn. 767, 699 A.2d 134 (1997).
In addition to introducing secondary evidence to prove the existence and terms of the missing policies, NU has also introduced evidence that it did diligently search for those policies. NU employees searched the records of NU. In addition, NTJ hired an insurance archaeologist to search for the policies. The court finds that NU has satisfied the second prong of the test enunciated in Connecticut Bank Trust Co. v. Wilcox, supra.
That is, that the policies are presently unavailable notwithstanding a diligent search to locate them.201 Conn. at 573.
(1) 1939-42 IINA Policy Issued to CLP
NU Exhibit 6 is an excess general liability insurance policy issued by IINA (policy no. MP 10856) to CLP for the period July 1, 1936 to July 1, 1939. NU Exhibit 13 is a June 3, 1940 CLP internal memorandum from R. K. Linsley, who was in charge of CLP's insurance, to his assistant, T. J. Flanagan, concerning insurance for litigation (the Lacas claim) brought against CLP. Attached to the memo was a copy of the IINA policy identified as NU Exhibit 6. The Linsley memo states that IINA policy no. MP 10856 (NU Exhibit 6) "has been completely renewed and is now in effect with the same company, but the settlement in this particular case would come under this policy and there may be slight differences between them." John Ireland, Director of Claims and Insurance for NU, testified that, based on his experience and review of NU files, NU Exhibit 6 was renewed by IINA for the 1939-42 period under the same terms and conditions.
Mr. Ireland and Bernard Buge, former executive vice president of INA and former senior vice president of CIGNA, both testified that NU Exhibit 6 was a manuscript policy tailored to CLP's business. Mr. Buge also testified that manuscript policies during this time period were put together using "previously-issued policies with different insureds that most paralleled the risk that you were trying to prepare a policy for;" or, in the case of CT Page 8026 a renewal, using the prior policy issued to that insured. (Id. at 143-44). It is certainly logical that, having specifically negotiated and tailored a policy for CLP's business, the parties would renew the policy under the same terms and conditions. Mr. Buge went on to testify that the arbitration clause included in NU Exhibit 6 was unique. The identical arbitration clause was included in subsequent policies issued to CLP. That clause provided:
 IF ANY DISPUTE SHALL ARISE BETWEEN THE COMPANY AND THE INSURED WITH REFERENCE TO THE INTERPRETATION OF THIS POLICY OR THE RIGHTS WITH RESPECT TO ANY TRANSACTION INVOLVED, THE DISPUTE SHALL BE REFERRED TO TWO ARBITRATORS, ONE TO BE CHOSEN BY THE COMPANY AND ONE BY THE INSURED, AND SUCH ARBITRATORS, SHALL CHOOSE AN UMPIRE, AND IN THE EVENT OF THE SAID ARBITRATORS NOT AGREEING, THE DECISION OF THE UMPIRE SHALL BE FINAL AND BINDING UPON ALL PARTIES. THE ARBITRATORS AND THE UMPIRE SHALL INTERPRET THIS POLICY AS AN HONORABLE ENGAGEMENT AND THEY SHALL MAKE THEIR AWARD WITH A VIEW TO EFFECTING THE GENERAL PURPOSE OF THIS POLICY IN A REASONABLE MANNER RATHER THAN IN ACCORDANCE WITH THE LITERAL INTERPRETATION OF THE LANGUAGE. ARBITRATION SHALL TAKE PLACE IN HARTFORD, CONNECTICUT.[1]
CIGNA does not dispute any of the aforementioned evidence. Instead, it points to one phrase in NU Exhibit 13, which states that "there may be slight differences between them [MP 10856 and the renewal]" (emphasis added). But CIGNA did not produce any evidence to identify any differences between the two policies.
Neither party has cited any statutory or other standards which might require an insurer like CIGNA to retain insurance policies which it has issued. Assuming that no such standard requires the retention of a liability policy for over fifty years, it nevertheless seems unfair to allow an insurer, who has not retained a copy of a policy, to escape its obligations thereunder by arguing the mere possibility that the terms of the renewal policy might be different from the known policy in some unspecified way.
Based on NU Exhibit 13, the testimony, IINA's admitted method of preparing manuscript policies, and the presumption that renewal policies contain the same terms and conditions as the original policy, the court finds that the 1939-42 IINA policy was renewed on the same terms and conditions as NU Exhibit 6, CT Page 8027 including the arbitration provision.
(2) Aetna Policy Nos. MCL 21162 (1956-59) and MCL 468557 (1959-62).
NU has introduced excerpts (NU Exhibit 26) of the transcript of testimony of Roy Seger, former NU Claims and Insurance manager (now deceased), at an arbitration hearing held in 1982 between CLP and Aetna pursuant to the Aetna policy identified as NU Exhibit 4 (the "Giglio arbitration"). Mr. Seger testified that there was one "renewable" policy issued by Aetna to CLP in 1956 and that it was "renewed continually" from 1956 until "sometime in the `70's." The gist of Mr. Seger's testimony is that each renewal policy during this period had the same terms and conditions as the first policy issued on July 1, 1956.
NU also introduced a copy of a memorandum of law (NU Exhibit 9) prepared and submitted by Aetna in that arbitration, in which Aetna's counsel represented that Aetna first issued an "excess general liability insurance policy" to CLP on July 1, 1956, and "[t]his policy with the portions referred to above unchanged, was renewed every three (3) years into the early 1970's." The author of NU Exhibit 9, Attorney Henry Ide, testified that these statements were accurate and that either (i) he saw the July 1, 1956 policy, the "first renewal of that policy" dated July 1, 1959, and the subsequent renewals; or, (ii) he confirmed their existence and the fact that they were "renewed every three (3) years" with an Aetna representative. The portions of the policy referred to by Attorney Ide were from Paragraph F., entitled "Appeals," which pertained to Aetna's liability for costs and expenses of appeals.
It is undisputed that the renewal policies issued by Aetna and CLP from 1962-1972 (NU Exhs. 1-5) contained similar terms and conditions. NU Exhibit 5, Aetna policy no. MCL 610108 for 1962-65, specifically states that it is a "renewal of MCL 468557", the unavailable policy for 1959-62. (NU Exh. 5, p. 1; April 5 Tr. at 63-64). NU Exhibit 4, Aetna policy no. EX 000101 for 1965-68, states that it is a "renewal of MCL 610108."
NU has also introduced a General Reinsurance (Gen Re) policy issued to CLP for the period 1956-59 (NU Exhibit 12) that provided a layer of insurance coverage immediately on top of the unavailable Aetna policy no. MCL 21162 covering the same period. Mr. Ireland testified that higher layer excess policies like NU Exhibit 12 usually "follow form" to — i.e., have the same terms CT Page 8028 and conditions as — the underlying policy (in this case, Aetna MCL 21162). He also testified that the terms and conditions of the Gen Re policy were similar to those of the Aetna renewal policies (NU Exhibits 1-5), including the identical arbitration provision.
Policies issued to CLP both before and immediately after these two unavailable policies at issue included identical
arbitration clauses. The 1936-39 IINA policy (NU Exh. 6) contained an arbitration provision identical (except for location) to the arbitration provision included in every Aetna policy that NU and CIGNA have found (NU Exh.1-5) and the Gen Re policy (NU ETh. 12). (April 5 Tr. at 38-44, 81). Both Mr. Buge and Mr. Ide testified that the arbitration provision was "unique;" Mr. Buge testified that it was specifically designed for CLP. (April 20 Tr. at 130, 143, 146-147). It is logical that the parties would not omit this and specially designed arbitration provision when every other available policy issued before and after included it. See Remington Arms Co. v. LibertyMut. Ins. Co., 810 F. Sup. 1420, 1423-28 (D. Del. 1992) (policies issued before and after provided evidence of policy terms).
The evidence shows (a) the missing policies were part of a continuous series of eight renewal policies issued by Aetna from 1956-1972; (b) the six policies that are available have similar terms, conditions, and identical arbitration provisions; (c) the Gen Re policy that sits on top of the first Aetna policy (MCL 21162, 1956-59) has similar terms and conditions to the subsequent renewal policies and an identical arbitration provision; and (d) every Aetna policy issued to CLP and introduced into evidence (NU Exh. 1-5) has the same arbitration provision.
CIGNA has introduced no evidence to rebut the presumption that renewal policies were renewed or the same terms and conditions as the original. Instead, it argues that the evidence introduced by NU proves only that the "Appeals" section of the missing policies was probably the same as that of the known policies. CIGNA again attempts to rebut the presumption of the terms of the unknown policies by arguing the possibility that they differed from those of the known policies without introducing any evidence as to what those differences were.
Based on the foregoing evidence and the legal presumption that the renewal policies contained the same terms and conditions CT Page 8029 as the original policy, the court finds that Aetna MCL21162 and MCL468557 existed and had the same terms and conditions as Aetna MCL 610108 including an identical arbitration clause.
Scope of Arbitration
The broad arbitration clauses found in the CIGNA policies demonstrate the parties' intent to resolve all disputes by arbitration, including disputes over the scope of arbitration. The CIGNA policies at issue in this litigation provide that:
 If any dispute shall arise between the company and the insured with reference to the interpretation of this policy or the rights with respect to any transaction involved, the dispute shall be referred to two arbitrators, one to be chosen by the company and one by the insured, and such arbitrators shall choose an umpire, and in the event of the said arbitrators not agreeing, the decision of the umpire shall be final and binding upon all parties. The arbitrators and the umpire shall interpret this policy as an honorable engagement and they shall make their reward with a view to effecting the general purpose of this policy in a reasonable manner rather than in accordance with the literal interpretation of the language.
Because the arbitration provision is a part of the policy, it provides that "any dispute" with respect to its interpretation "shall" be referred to arbitration.
Where, as here, there is a broad arbitration clause, the identity and nature of the disputes to be submitted to arbitration should be determined by the arbitrators.Bio-Polymers, Inc. v. D'Arrigo, 23 Conn. App. 107, 110-11,579 A.2d 122, 124 (1990).
 The intention to have arbitrability determined by an arbitrator can be manifested by an express provision or through use of broad terms to describe the scope of arbitration, such as "all questions in dispute and all claims arising out of' the contract or "any dispute that cannot be adjudicated."
Board of Education v. Frey, 174 Conn. 578, 581, 392 A.2d 466
(1978). "Moreover, if the arbitration agreement is ambiguous as to whether the issue in dispute is arbitrable, the arbitration CT Page 8030 act requires the court to resolve the ambiguity in favor of arbitration of the issue." Levine v. Advest Inc., 244 Conn. 732,749, 714 A.2d 649, 656 (1998). See also First Options of ChicagoInc. v. Kaplan, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); White v.Kampner, 229 Conn. 465, 472-73, 641 A.2d 1381 (1994); Board ofEducation v. Frey, 174 Conn. 578, 582, 392 A.2d 466 (1978).
Under the broad arbitration provision present in the policies at issue, the arbitrators interpret the policies and resolve all disputes between CIGNA and NU, including which sites fall under the coverage provided by these policies and whether a particular issue is arbitrable.
Given the breadth of the arbitration clause and the strong public policy favoring the referral of issues to arbitration, the court hereby orders that CIGNA submit to arbitration of all disputes concerning the ten insurance policies identified on page 2 hereof.
Motion to Stay Arbitration
Where there is a claim of environmental damages, as in the present case, it is not uncommon to find that many different insurance policies spanning many years apply to the same site. Where some of those policies contain arbitration provisions and some do not, it might well be inevitable that identical coverage issues would have to be arbitrated/litigated in two separate fora. In such a case the decision to stay litigation could be based on the desire to save the parties from the burdens of litigating the same issues with the same witnesses at the same time. Fortunately, as the parties have conceded, the policies which contain arbitration provisions do not pertain to the sites covered by the PSNH insurance policies, which lack arbitration provisions. NU has conceded that the PSNH line of coverage is separate and distinct from the line of coverage that CIGNA issued to CLP/NU. NU has also conceded that there is no overlap between these two separate and distinct lines of coverage. Therefore, the court need not address the issue of simultaneous arbitration/litigation of identical issues.
Both NU and CIGNA have indicated that they want a prompt resolution of all of NU's coverage claims, including the claims that NU concedes are non-arbitrable. NU has also conceded that it will not be prejudiced if it is required to litigate the non-arbitrable claims simultaneously with any arbitration, and that a CT Page 8031 prompt resolution of both the arbitrable and non-arbitrable issues will be in NU's best interests
Any arbitration with respect to the CLP/NU line of coverage and sites will necessarily be lengthy and time-consuming. This is inevitable due to the substantial number of sites (approximately 77) and policies (ten) involved in this case, and given the fact that no arbitrators have yet been chosen, no procedures agreed upon, and no discovery has even begun. In light of the foregoing, the arbitration will probably take a considerable period of time.
Coverage issues relating to the PSNH policies and sites will need to be litigated regardless of the outcome of any arbitration or any rulings made during that proceeding. As such, a stay of the entire litigation will not do anything to resolve or even narrow the issues that will need to be addressed by the Court in the litigation. Instead, such a stay will only delay the resolution of the non-arbitrable claims — a result that neither NU nor CIGNA wants.
The Law
Where the litigation involves both arbitrable and non-arbitrable claims courts of this state, other states and federal courts have refused to stay the entire litigation, and have allowed the litigation to proceed with respect to any non-arbitrable claims. See, e.g., Beaumont v. Swiderki, No. 119276, 1994 WL 161300 (Conn.Super. April 26, 1994, W. Sullivan, J.) (motion to stay entire litigation pursuant to C.G.S. § 52-409
denied with respect to non-arbitrable issues); MetropolitanEntertainment Co. v. Koplik, 20 F. Sup.2d 354, 363 (D. Conn. 1998) (same holding under § 3 of the Federal Arbitration Act).
The decision whether to stay a litigation in situations where there are arbitrable and nonarbitrable issues is largely a matter within the court's discretion. Genesco, Inc. v. T. Kakiuchi Co., 815 F.2d 840, 856 (2d Cir. 1987); Norton v. CommercialCredit Corp., No. CV 98-0578441-S, 1998 WL 729700 (Conn.Super. Oct. 6, 1998, Rittenband, J.) (court applied Genesco test to deny motion to stay litigation pending arbitration); General BuildingLaborers' Local 66 v. Slattery, 116 Lab. Cas. P. 10, 355, 1990 WL 80156 (E.D.N.Y. 1990) ("[a] determination of whether a stay pending arbitration should be granted is based on the specific circumstances of the case"). This is true under both the Federal CT Page 8032 Arbitration Act ("FAA") and, Connecticut General Statutes §52-409.
In Beaumont v. Swiderski, No. 119276, 1994 WL 161300 (Conn.Super. April 26, 1994), the court addressed this exact issue of whether to stay an entire litigation where both arbitrable and nonarbitrable claims are present in an action. In that case, the plaintiff filed an action for breach of contract against two defendants, only one of whom was a party to the contract. The contract contained an arbitration provision. The defendants moved to compel arbitration and stay the litigation. The court found that under § 52-409 a stay was warranted only "on issues thatare referable to arbitration." Id. at *2. (emphasis added.) The court thus stayed only that portion of the litigation involving the arbitrable claims and allowed the balance of the litigation involving the non-arbitrable claims to continue.
The federal district Court of Connecticut reached a similar result in Metropolitan Entertainment Co. v. Koplik,20 F. Sup.2d 354, 363 (D. Conn. 1998). In that case, the plaintiffs sued a former employee for breach of contract and for certain related claims. The defendant counterclaimed and plaintiffs moved to compel arbitration with respect to certain of the counterclaims and to stay the litigation pending arbitration. The court held that since only certain claims were arbitrable, a stay should not be granted with respect to the entire litigation. As such, it denied the stay with respect to all non-arbitrable claims. Id.
Other courts have reached similar results and have denied motions to stay where arbitrable and non-arbitrable claims were involved. See, e.g., Jubilant Voyager Corp., 1983 A.M.C. 426, 1982 WL 2280, *1 (E.D. Va. 1982) (stay pending arbitration not appropriate where "a party's arbitrable and non-arbitrable claims cannot be practically separated" or where stay "would result in undue delay and hardship to all others involved in th[e] litigation"); O'Driscoll v. Merrill Lynch, Fed. Sec. L. Rep. P, 99, 486, 1983 WL 1360, *6 (S.D.N.Y. 1983) (stay denied due to "risk that issues that should properly be determined by this court would be decided by the arbitrators"); Breyer v. FirstNational Monetary Corp., 548 F. Sup. 955, 962 (D.N.J. 1982) (stay denied where arbitrable and non-arbitrable claims were inextricably related).
The goal of the FAA and the Connecticut arbitration statutes, which were enacted to ensure judicial enforcement of private CT Page 8033 agreements to arbitrate "is not advanced by forcing a litigant that has not agreed to arbitrate to delay the prosecution of its claims [pending arbitration]." Montauk Oil Transportation Corp. v.Steamship Mutual Underwriting Association (Bermuda) Ltd.,859 F. Sup. 669, 677 (S.D.N.Y. 1994).
In Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 221, 105S.Ct. 1238, 84 L.Ed.2d 158 (1985) the Supreme Court addressed the issue of bifurcated proceedings and noted:
 We therefore are not persuaded by the argument that the conflict between two goals of the Arbitration Act — enforcement of private agreements and encouragement of efficient and speedy dispute resolution — must be resolved in favor of the latter in order to realize the intent of the drafters. The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we vigorously enforce agreements to arbitrate, even if the result is "piecemeal" litigation.
(Emphasis added). In his concurring opinion, Justice White reiterated this point and stated:
 [O]nce it is decided that the two proceedings are to go forward independently, the concern for speedy resolution suggests that neither should be delayed. While the impossibility of the lawyers being in two places at once may require some accommodation in scheduling, it seems to me that the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course.
470 U.S. at 225 (emphasis added).
In this case the subject matter of the litigation and that of the arbitration do not overlap, NU will not be prejudiced if CIGNA continues to litigate issues related to the PSNH insurance policies in this court, but CIGNA will be prejudiced if it must delay discovery related to non-arbitrable issues. Therefore, the Motion to Stay litigation concerning the policies which do not contain arbitration provisions is denied.
By the court, CT Page 8034
Aurigemma, J.